**Paul DAYTON, Plaintiff,**

**v.**

**The CZECHOSLOVAK SOCIALIST REPUBLIC, et al., Defendants.**

**Joseph E. STIASSNI, et al., Plaintiffs,**

**v.**

**The CZECHOSLOVAK SOCIALIST REPUBLIC, et al., Defendants.**

**Civ. A. Nos. 85–0032, 85–0360.**

United States District Court, District of Columbia.

Dec. 19, 1986.

Samuel Herman, Washington, D.C., for plaintiffs.

Stephen M. Boyd, Peter D. Ehrenhaft, Bryan, Cave, McPheeters & McRoberts, Washington, D.C., for Centrotex Co., Inc.

## MEMORANDUM

OBERDORFER, District Judge.

### I.

These cases involve claims for compensation arising from the nationalization of the plaintiffs' textile production plants by the government of Czechoslovakia. The plaintiffs are members of a group called the "Benes" claimants. Their property was nationalized on October 25, 1945, by the regime of President Edward Benes who promised them compensation. Czechoslovak Nationalization Decree No. 100/45 Sb. Plaintiff Dayton became a citizen of the United States on July 25, 1946; the predecessors of the Stiassni plaintiffs became citizens on December 14, 1945 and January 21, 1946. On February 28, 1948, the Communists came to power in Czechoslovakia and refused to honor the promise of compensation extended by the Benes government.

In 1961 and 1962, the plaintiffs sought compensation for their losses under Title IV of the International Claims Settlement Act of 1949, 22 U.S.C. § 1642. That Act authorized the Foreign Claims Settlement Commission of the United States ("the Commission") to compensate U.S. nationals whose Czechoslovakian property was taken by using the proceeds of the sale of certain Czechoslovakian assets seized by the United States. However, the Commission denied the claims of the plaintiffs based on their findings that the plaintiffs had not been U.S. nationals on the date their property was nationalized.[1] Following awards to other U.S. citizens, the U.S. government participated in extensive negotiations with the government of Czechoslovakia to obtain additional compensation. A claims agreement for $81,500,000 was finally reached between the Czechoslovakian and United States governments in late 1981. This agreement excluded any claimants who had not been United States citizens on the date their property was nationalized. However, Congress expressly altered the agreement to provide that a portion of the settlement should be used to compensate the Benes claimants. See Czechoslovakian Claims Settlement Act of 1981 at § 6, Pub.L. 97–127, Dec. 29, 1981, 95 Stat. 1675, reprinted in 22 U.S.C.A. Ch. 21, Sub. Ch. IV. Pursuant to this congressional directive, the plaintiffs in these cases applied for, and received, some compensation for their losses.[2] The current law suits seek to recover the "unpaid balance" of their claims for compensation.

### II.

Plaintiffs have sued the Czechoslovakian government and Centrotex which is a tex-

---

1. See In the Matter of the Claim of Mary Dayton and Paul Dayton, FCSC Decision No. CZ–1022 (February 20, 1961); In the Matter of the Claim of Charles Stiassni and Joseph Stiassni, FCSC Decision No. CZ–3491 (June 29, 1962); In the Matter of the Claim of Estate of Hermine Stiassni and Estate of Alfred Stiassni, FCSC Decision No. CZ–3492 (June 29, 1962).

2. The Commission determined that plaintiff Paul Dayton was entitled to $601,167 in principal and $459,289.94 in interest for the nationalization of his textile interests. See Complaint at ¶ 10 and Exhibits A & B. On July 22, 1983, the Treasury Department paid Mr. Dayton a total of $125,114.00 on that award (approximately 12%). The Commission also determined that the Stiassni claimants were entitled to a total of $2,000,000 in principal and a total of $1,890,000 in interest. See Complaint at ¶ 10 and Exhibits A, B, C, & D. On July 20, 1983, the Treasury paid these plaintiffs a total of approximately $500,444.80 on that amount (approximately 13%).

tile trading entity. A March 27, 1986 Order dismissed the complaints in accordance with a report from the United States Attorney, appearing as *Amicus Curiae*, that stated that service had not conformed with the applicable international conventions for the service of process on alien parties. After dismissal, the Department of State forwarded two copies of the complaints and translations to the American Embassy in Prague, which delivered them to the Czechoslovakian Foreign Ministry there. An April 28, 1986 Order granted the motion to vacate the order of dismissal. No answer has been received from the Czechoslovakian government. However, defendant Centrotex filed a motion to dismiss the complaint on September 8, 1986. This motion, and the plaintiffs' motion to renew an earlier motion for entry of default against Czechoslovakia are currently before the Court. A hearing was held on these motions on November 5, 1986. For the reasons discussed below, the defendant's motion to dismiss the complaints will be granted and plaintiffs' motion for entry of default will be denied.

### III.

Centrotex argues that while the complaints may have been properly forwarded to the Czechoslovakian government, they still have not been properly served on Centrotex. It is undisputed that Centrotex has received copies of the complaints.[3] Nonetheless, Centrotex argues that the provisions of the Foreign Sovereign Immunities Act were not complied with since translated copies of the complaints were not delivered to an agent or officer of Centrotex in the United States or forwarded to Centrotex through the Ministry of Justice of Czechoslovakia. 28 U.S.C. § 1608(b). Centrotex also argues that it received the complaints *before* they were dismissed and that the plaintiffs were obliged to *re-serve* the complaints after the dismissal was vacated.

The Centrotex claim that the complaints must be re-served is without merit. How-

ever, plaintiffs offer no response to the failure to effect service through the Ministry of Justice. This failure is a basis for dismissal of the complaints. If there were not other dispositive defenses mounted here, the Court would be reluctant to rest a dismissal on such a technicality. But as developed below, there are more satisfying alternate grounds for dismissal.

### IV.

Claims by United States citizens against instrumentalities of foreign governments are governed by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, which provides that such entities are immune from the jurisdiction of the United States courts unless one of the statutory exceptions applies. Plaintiffs allege that their complaints fall under § 1605(a)(3) which provides for an exception where "rights in property taken in violation of international law are in issue" if that property "is owned or operated by an agency or instrumentality of a foreign state" that is "engaged in commercial activity in the United States."

Defendant has two arguments why plaintiffs have failed to surmount the FSIA. First, defendant points out that in order to sue a foreign instrumentality under § 1605(a)(3), the plaintiff must allege that the property was taken "in violation of international law." Defendant argues that it is not a violation of "international law" for a state to take the property of one of its own citizens. The Commission has already determined that plaintiffs were Czechoslovakian citizens on October 27, 1945, the date their property was nationalized. *See supra* at n. 1. Therefore, according to Centrotex, there is no possible violation of "international law." This argument, however, fails to recognize that the nationalization of the plaintiffs' property proceeded in two steps. There was no violation of international law in 1945 when the government nationalized the property of its citizens and promised to compensate them.

---

**3.** On August 27, 1985, Mr. Jiri Koutnik, the President of Centrotex, filed a memorandum "In

Answer" to the plaintiffs' complaints.

When the government repudiated this promise in 1948, however, the plaintiffs were American citizens. This repudiation of the promise to compensate may constitute a separate "taking" of the plaintiffs' property which was in violation of "international law." This issue can not be resolved on a motion to dismiss.

Defendant's second argument under the FSIA is more persuasive. The Act requires that the property at issue be owned by an instrumentality of a foreign state that is engaged in commercial activity in the United States. While defendant Centrotex concedes that it is an instrumentality of a foreign state that engages in commercial activity in the United States, it argues that it does not own the textile plants in question or any textile plants. Rather, an affidavit of Miroslav Otta (attached to the Defendant's Motion to Dismiss) states that Centrotex is engaged solely in the purchase and sale of textiles. According to this affidavit, Centrotex is a joint stock company whose shareholders are the National Commercial Bank, eleven "trusts" made up of individual textile production enterprises, and sixty textile and garment producing enterprises.[4] Otta Affidavit at ¶ 5. Centrotex obtains raw materials for these enterprises and purchases their products for resale to customers through foreign sales representatives. It does not, however, *own* the factories in question here, or any other textile production facilities.

Plaintiffs' response to this jurisdictional argument is not convincing. They argue that Centrotex is an essential part of the planned socialist economy of Czechoslovakia; without it, the government owned textile production enterprises would not be able to trade in international markets. According to the plaintiffs, "Centrotex, far from being an independent juristic personality, a mere 'commodity trader', is an alter ego of the Czechoslovak Socialist Republic in the effectuation and implementation of its nationalization of the Czechoslovak textile industry including the textile plants of the plaintiffs." Plaintiffs' Opposition to the Motion to Dismiss at 10. Plaintiffs therefore urge this Court to "pierce the corporate veil" in order to avoid injustice. In support of this proposition, plaintiffs cite to *First National City Bank v. Banco Para El Comercio Exterior de Cuba, (Bancec)* 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983), in which the Supreme Court held that a state owned Cuban bank could be held liable for a nationalization claim against the government of Cuba. Plaintiffs argue that the *Bancec* case authorizes this Court to find Centrotex jointly and severally liable for the actions of the Czechoslovakian government. However, in *Bancec*, the Cuban bank sued in the United States to recover on a claim against First National City Bank; the American bank then raised the nationalization claim as a *counterclaim.* The holding of *Bancec* is heavily dependant on this unique fact situation; as the Supreme Court noted in conclusion,

> [Our decision] is the product of the application of internationally recognized equitable principles to avoid the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law.

*Id.* at 633–34, 103 S.Ct. at 2603. In this case, neither defendant has availed itself of the benefits of the United States courts. In this situation, therefore, the Court should apply the general rule articulated by the Supreme Court that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.* at 626–27, 103 S.Ct. at 2600.

 Thus, 28 U.S.C. § 1605(a)(3) does not give this Court jurisdiction over the plaintiffs' claims against Centrotex. At oral argument in this case, however, counsel for the plaintiffs suggested that 28 U.S.C. § 1605(a)(1), which provides that the sovereign immunity of a foreign instrumentality can be waived, establishes a separate basis for jurisdiction under the FSIA. Ac-

**4.** These production enterprises are supervised by the Ministry of Industry; their managing directors are appointed by the "Office of the Textile Industry." Otta Affidavit at ¶ 6.

cording to this theory, the government of Czechoslovakia waived the sovereign immunity of Centrotex when it provided the company with the capacity to "sue and be sued." *See* Otta Affidavit at § 5. This argument was also advanced in a post-hearing memorandum filed by the plaintiffs on November 17, 1986. Since this basis for jurisdiction is not alleged in the complaints, it would be necessary for the plaintiffs to amend their complaints in order to proceed under this theory. More importantly, defendant's response to this post-hearing memorandum demonstrates that Congress intended to extend sovereign immunity to all foreign state instrumentalities endowed with the capacity to sue and be sued when it enacted the FSIA. Section 1603(a) of the Act defines "foreign state" to include an agency or instrumentality of a foreign state as defined in Section 1603(b). Section 1604 provides that a foreign state "shall be immune from the jurisdiction of the courts of the United States ... except as provided in sections 1605 to 1607." Moreover, the legislative history to § 1603 establishes that entities with the capacity to "sue and be sued" were included within the protections of § 1604. The House Report on the FSIA states:

(b) *Agency or instrumentality of foreign state.* Subsection (b) defines an 'agency or instrumentality of a foreign state' as any entity (1) which is a separate legal person, (2) which is an organ of a foreign state or of a political subdivision of a foreign state, or a majority of whose shares or other ownership interest is owned by a foreign state's political subdivision....

The first criterion, that the entity be a separate legal person, is intended to include a corporation, association, foundation, or any other entity which, under the law of the foreign state where it was created, can *sue or be sued in its own name,* contract in its own name or hold property in its own name.

H.R.Rep. No. 1487, 94th Cong.2d Sess. 15, U.S.Code Cong. & Admin.News 1976, pp. 6604, 6613–14. The plaintiffs' request to amend the complaints will therefore be denied.

## V.

■ The sovereign immunity recognized in the FSIA is supplemented by the "Act of State Doctrine" which "precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401, 84 S.Ct. 923, 926, 11 L.Ed.2d 804 (1964). Unlike the doctrine of sovereign immunity, however, the Act of State doctrine is not jurisdictional. Instead, it is a "prudential doctrine designed to avoid judicial action in sensitive areas." *See IAM v. OPEC,* 649 F.2d 1354, 1359 (9th Cir.1981). The policy of the Act of State doctrine has been expressed as follows:

The doctrine ... expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere.

*Sabbatino,* 376 U.S. at 423, 84 S.Ct. at 938. While this doctrine has been described as a form of federal common law, it has not been superceded by the enactment of the FSIA. *See Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1113 n. 12 (5th Cir.1985); *IAM v. OPEC,* 649 F.2d 1354, 1359 (9th Cir.1981). Moreover, it is directly applicable to claims arising out of nationalization of property. As the Supreme Court has stated,

[t]he Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

*Sabbatino,* 376 U.S. at 428, 84 S.Ct. at 940.

■ The principles behind the Act of State doctrine are particularly applicable here. These cases arise over Czechoslovakia's nationalization of the property of

persons who were citizens of that country at the time their property was seized. Moreover, the Czechoslovakian nationalization program has been the subject of extensive negotiations between the United States and Czechoslovakia, negotiations which resulted in a large settlement. The plaintiffs themselves received some compensation out of that settlement. *See infra* at n. 2. It would be inappropriate at this late date for a court to hold that the Czechoslovakian government or one of its instrumentalities should be exposed to further liability.

Plaintiffs argue that the Act of State doctrine should not be applied because there exists a "treaty or other unambiguous agreement regarding controlling legal principles," namely the November 14, 1946 agreement between the United States and Czechoslovakia which provided as follows:

> The Government of the United States and the Government of Czechoslovakia will make adequate and effective compensation to the nationals of one country with respect to their rights or interests in properties which may have been or may be nationalized or requisitioned by the Government of the other country. In this connection, the Government of the United States has noted with satisfaction that negotiations concerning compensation on account of such claims will shortly begin in Praha.

This agreement does provide that Czechoslovakia will compensate American citizens whose property was nationalized. However, as the plaintiffs themselves point out, the agreement "contains no reference to *when the property owners became such nationals for purpose of being included in settlement coverage.*" Plaintiffs' Memorandum in Opposition to the Motion to Dismiss the Complaints at 21–22 (emphasis in original). The agreement does not, therefore, establish an "unambiguous" controlling legal principle in this case. Furthermore, the issue of whether the plaintiffs were covered under any negotiated agreements between the two countries was finally settled by Congress in 1981 when it provided for *ex gratia* payments to the Benes claimants. *See infra* at 13. The

Act of State doctrine commands that this Court refrain from interfering with this policy determination by a separate branch of government.

Plaintiffs also argue that they do not seek to challenge the validity of a nationalization decree but instead seek restitution for "unjust enrichment," i.e., the failure of the present Czechoslovakian regime to honor the Benes commitment to pay compensation. However, this argument proves too much. Clearly, this Court lacks the power to return the plaintiffs' property to them; therefore the only possible remedy the plaintiffs could be seeking is damages. The Act of State doctrine can not be defeated by classifying all actions arising out of nationalizations of property as suits to remedy "unjust enrichment."

### VI.

As mentioned above, the Benes claimants were not originally included in the 1981 settlement agreement. However, after the agreement had been initialed by both parties on November 6, 1981, Congress passed the Czechoslovakian Claims Settlement Act which approved the agreement with certain amendments. *See* Pub.L. 97–127, Dec. 29, 1981, 95 Stat. 1675, *reprinted in* 22 U.S. C.A. Ch. 21, Sub. Ch. IV. Section 6(a) of the Act provided for *ex gratia* payments to be made to the Benes claimants. The statute explained that

> while the Commission had the authority to deny [the Benes claims] on the basis that the properties involved had been taken by the Benes Government while the claimants were not yet nationals of the United States, the effect of that denial is to withhold compensation to persons who have been United States citizens for many years and whose expropriated property has benefited the Communist Government of Czechoslovakia no less than properties expropriated more directly and clearly by the Communist Government.

*Id.* at § 6(a)(1)(B). The plaintiffs in these actions therefore received payments in partial compensation of their loss out of the $81.5 million dollar settlement fund. However, plaintiffs argue that this settlement

was not negotiated on their behalf and did not have the effect of extinguishing their claims.

The 1981 agreement states that it is in "full settlement and discharge" of

All claims of the Government of the United States or nationals of the United States against the Czechoslovak Government based on measures of nationalization, expropriation, disposition or other restrictive measures involving takings of their properties, rights, and interests, or any other property, which arose prior to the date of entry into force of this Agreement.

Agreement on the Settlement of Certain Outstanding Claims and Financial Issues, entered into force February 2, 1982, Article 1, 21 I.L.M. 371 (1982). However, the agreement defines "the claims of nationals of the United States" as follows:

those which are outstanding and unsettled claims ... which, from the date of such nationalization or other taking to the date of entry into force of this Agreement have been continuously owned by individuals who are nationals of the United States....

*Id.* at Article 2. This description may not cover the plaintiffs in these cases since their property was nationalized before they became United States citizens.[5] However, this language was drafted *before* Congress modified the agreement to provide for payments to the Benes claimants. Thus, it is fair to conclude that Congress expected any claims these plaintiffs had to be extinguished once they were included in the settlement agreement. In fact, the language from the statute quoted above suggests that Congress believed that the Benes claimants had no other way of obtaining compensation. *See supra* at 13. This may account for Congress' failure explicitly to extinguish their claims.

While the words of the treaty may not cover the plaintiffs, they were included in the final distributions. Regardless of whether it acted to extinguish the plaintiffs' claims, therefore, the 1981 settlement agreement provides a further reason why the Court should abstain from hearing the plaintiffs' claims in these cases.

## VII.

Finally, Centrotex argues that these suits are barred by the statute of limitations. The parties agree that the relevant statute of limitations in this case is three years.[6] It has now been over forty years since this property was nationalized. Plaintiffs argue that the delay is excusable because they were unable to pursue their claims while the U.S. government was "espousing" them through international negotiation. According to the plaintiffs, it was not until the July 22, 1983 Treasury payment to the plaintiffs that their right to institute and carry through an action commenced. As defendant points out, this "espousal" theory is inconsistent with the plaintiffs' contention that they were not covered by the 1981 agreement which concluded the governments' negotiations. Furthermore, the 1961–62 decisions of the Commission established that the plaintiffs' property would be considered nationalized while they were still Czechoslovakian citizens for the purposes of any settlement agreement between the United States and Czechoslovakia. Thus, it should have been clear to the plaintiffs by 1962 that their claims were not being "espoused" by the United States government. For all these reasons, the accompanying order will grant defendant's motion to dismiss the complaints. The plaintiffs' motion to renew their earlier motion for entry of default against Czechoslovakia will therefore be denied.

---

**5.** As noted earlier, however, it might be possible to view the 1948 repudiation of the earlier promise to compensate as a separate "taking" of the plaintiffs' property. *See supra* at 5–6.

**6.** D.C.Code § 12–301 prescribes the following limitations periods:

(2) for the recovery of personal property or damages for its unlawful detention—3 years;
(3) for the recovery of damages for an injury to real or personal property—3 years.