United States Court of Appeals,

Fifth Circuit.

Nos. 91–2180, 91–6311.

ARRIBA LIMITED, Plaintiff-Appellee,

v.

PETROLEOS MEXICANOS, a/k/a Pemex, Defendant-Appellant.

June 11, 1992.

Appeals from the United States District Court for the Southern District of Texas.

Before DAVIS, JONES, and EMILIO GARZA, Circuit Judges.


EDITH H. JONES, Circuit Judge:

Petroleos Mexicanos ("Pemex"), the national oil company of the United Mexican States, appeals the district court's denial of its motion to dismiss for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602–11. Pemex, one of the world's largest oil companies and crude oil exporters, was sued by Arriba, Ltd., a Bahamian corporation with its principal place of business in the United States, for damages stemming from a failed contract between Arriba and an arm of Pemex's union, the Petroleum Workers Union of Mexico, Sindicato de Trabajadores Petroleros de la Republica Mexicana ("the Union"). The district court held that Pemex failed to establish that its activities fell outside the "commercial activities" exception to the FSIA's recognition of sovereign immunity. *See* 28 U.S.C. § 1605(a)(2). Because we hold that Pemex is entitled to sovereign immunity, we reverse the district court's ruling and dismiss Arriba's action with prejudice.[1]

---

[1]Pemex alternatively contends that even if the commercial activities exception applies, the Act of State doctrine renders this case non-justiciable. Pemex raised the Act of State doctrine in its motion to dismiss, but the district court did not address this issue in its January 28, 1991 ruling. Following that decision, Pemex moved to certify both the sovereign immunity and Act of State questions for interlocutory appeal. 28 U.S.C. § 1292(b). The court granted Pemex's motion as well as its request for a stay pending appeal. The appeal on the Act of State doctrine was filed under a separate case number in this court [case No. 91–6311], but the discussion below renders that appeal moot.

I.

BACKGROUND

This is the latest in a series of lawsuits that Arriba has brought since 1985 against the Union, its private contracting arm, Comision de Contratos del Sindicato de Trabajadores Petroleros de la Republica Mexicana ("the Commission"), and several former Union officials. Pemex is a relative newcomer to the litigation, having been sued by Arriba for the first time in 1990. All these lawsuits flow from a single 1984 transaction in which several officials of the Union and its Commission allegedly agreed to supply Arriba with Pemex's residual or "slop" oil at bargain prices—without the need for a contract with Pemex. Arriba apparently owes its very corporate existence to this ill-starred venture.

According to its amended complaint, Arriba was chartered in 1984 as a direct result of negotiations between Bill Flanigan, who went on to serve as Arriba's president, and "persons who were acting as the agents and representatives" of Pemex, the Union and its Commission.[2] As part of a written agreement signed at Houston, Texas in October of that year ("the Agreement"), the Commission agreed to sell Arriba a minimum of 6 million barrels of Pemex's residual oil. The Agreement was signed by one Ramiro Quinones Fabela ("Quinones"), who Arriba asserts had presented proof of his authority to act on the Commission's behalf. Relying on representations by Quinones and his associates, Arriba contracted to sell the residual oil at a substantial profit. Beginning in November 1984, however, Quinones and others demanded payments from Arriba, to be used to bribe Pemex and Union officials to perform their part of the Agreement. Arriba refused to pay—despite repeated protests from Quinones and his companions, who twice physically assaulted Flanigan. Arriba never received the oil, even after Flanigan met with various Commission and Union officials and was assured that its delivery was forthcoming.

---

[2]The complaint cryptically alleges that at the Union's suggestion, Arriba was incorporated in the Bahamas "because of the Sindicato's own banking relationships there."

Arriba admits that the Agreement was structured to avoid any direct dealings with Pemex officials or any other branch of the Mexican government.[3] It is therefore important to understand who Arriba considers to be Pemex's "agents." Pemex was not a party to the Agreement, and Arriba never negotiated with Pemex for the purchase of oil. Instead, Arriba insists that Quinones and his associates should be considered Pemex's "agents" by implication. Pemex's activities were "inextricably integrated" with those of the Union and its Commission, Arriba argues, so that all three functioned as a single entity. As described in the complaint, the three entities

> often serve as agents for one another. They make promises and representations for one another. They stand behind one another's contracts. The business of each is structured so that it is necessarily dependent upon the cooperation of the others.

Borrowing some familiar terms from American corporate law, Arriba argues that Pemex's status as a government agency is a sham that should not be respected. The separate legal identities of Pemex, the Union and the Commission have blurred into a single functional entity, making each of them "alter

---

[3]This circumspection may not be surprising. Although we need not decide the issue, Pemex asserts that Arriba's agreement to purchase oil from Pemex through private intermediaries was illegal under Mexican law. According to an opinion by Mexico's Attorney General prepared for this litigation, an official proclamation of Mexico's then-Secretary of Budget and Planning, Carlos Salinas de Gortari, issued on Jan. 28, 1984—nine months *before* the Agreement was signed—declared all government contracts which failed to comply with certain public contracting procedures to be null and void. This proclamation prevented Pemex from granting concessions to the Union on oil sales. *See* MEX. ATTY. GEN. OP. ¶¶ 40–44 (Aug. 24, 1990). Prior to the proclamation, a fixed percentage of Pemex contracts was granted to the Union without public bidding. "It was contemplated," the opinion observes,

> that the Union would either perform these [no-bid] contracts directly or by subcontract, retaining some percentage as profit; the profit in either case was expected to finance social programs for the workers. In practice, however, the Union's leaders created the Commissions in order to keep the profit outside of the Union, so that workers themselves did not benefit. PEMEX, in turn, was also damaged because it did not receive the best terms when contracting.

> *Id.* at ¶ 42. The Salinas proclamation was part of President Miguel de la Madrid Hurtado's "moral renovation" campaign aimed at fighting corruption in the letting of government contracts. *See, e.g., Mexico Carries War on Corruption to Unions,* N.Y. TIMES A7, col. 1 (Feb. 6, 1984). Both Pemex and the United Mexican States as *amicus curiae* suggest that Arriba had reason to tread lightly in the face of a high-profile government initiative that rendered illegal the type of arrangement that Arriba now seeks to enforce. *See also* ATTY. GEN. OP. at ¶¶ 44–47.

egos" of the other and permitting Arriba to "pierce the veil" to reach Pemex's assets.[4]

Arriba sued the Union, its Commission, Quinones and three other Union officials for the first time in June 1985, obtaining a $92 million default judgment in Texas state court the following April. Attempting to satisfy that judgment, Arriba secured a writ of garnishment against Pemex in February 1987. Pemex removed the garnishment proceedings to federal court and sought to dismiss on sovereign immunity grounds. Meanwhile, Arriba entered into negotiations with the Union and its Commission involving the creation of a new joint venture. These talks led to a settlement in October 1987 that released the default judgment and dismissed the garnishment action against Pemex with prejudice.[5]

Nearly two years later, Arriba returned to state court, alleging that the Union's and Commission's refusals to abide by the settlement terms revived its claims arising from the 1984 Agreement. In April 1989, the court granted a second default judgment against the Union, its Commission and the private defendants—this time including punitive damages boosting the total award to more than $273 million. Arriba again obtained a writ of garnishment against Pemex in an attempt to execute the two default judgments,[6] and Pemex again removed to federal court. Arriba's

---

[4]Thus, for instance, Arriba treats Quinones' alleged representations on behalf of the Commission—a private entity—as if they had been made by Pemex itself. That Quinones allegedly represented the Commission transformed him into Pemex's "agent" as well. The legal implications of Arriba's "agency" and "alter ego" theories on Pemex's status as a government agency asserting sovereign immunity are discussed below.

[5]In a bizarre twist, Arriba and Flanigan had themselves been sued in May 1987 by what appellant acknowledges was "[a] second, different Arriba Limited (the "Second Arriba')." Like its namesake, the Second Arriba was incorporated in the Bahamas. Arriba's complaint asserts that Pemex, the Union and the Commission conspired to create the Second Arriba so that this "bogus new entity [would] sue Arriba to enjoin it from enforcing Arriba's valid judgment, which the new entity falsely alleged belonged to it. That suit was an obvious sham, designed to mislead and defraud the courts." Arriba and Flanigan counterclaimed against the Second Arriba in June, renewing their allegations against the Union and the Commission stemming from the 1984 Agreement. However, the October 1987 settlement apparently ended the Second Arriba's lawsuit against Arriba.

[6]The following June, Arriba—armed with a temporary restraining order from the Harris County court—attempted to attach the official plane of Mexican President Salinas after it had

amended complaint asserts that Union officials informed Arriba that Pemex had begun "stripping the assets" of the Union to prevent Arriba from enforcing its judgment. Those same officials also allegedly warned Flanigan that he faced criminal prosecution by Mexican authorities if he continued to pursue legal remedies.

On May 31, 1990, while Pemex's motion to quash the writ of garnishment was pending, Arriba filed its first action against Pemex in the federal district court for conduct stemming from the 1984 Agreement. Among other things, Arriba accused Pemex of engaging in a pattern of racketeering activity in Mexico as well as theft by extortion under Texas law. Relying on the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a)–(d), Arriba sought treble damages, costs of suit, attorneys fees, and other relief. The district court later consolidated Arriba's RICO action with its applications for writs of garnishment against Pemex for the 1986 and 1989 default judgments. The claimed damages had now ballooned to more than $1 billion.

Pemex moved to dismiss the consolidated action based on the FSIA, arguing in the alternative that the case was non-justiciable under the Act of State doctrine. The district court rejected Pemex's sovereign immunity defense, prompting this appeal.[7]

II.

---

landed at Love Field in Dallas, Texas. This effort fizzled when Mexican authorities demonstrated that the Boeing 757 belonged to their government.

[7]The district court also ruled that because the state court judgment against the private defendants did not involve Pemex, Arriba had failed to obtain a judgment against a foreign state or its instrumentality within the meaning of § 1602 of the FSIA. Consequently, Arriba could not attach Pemex's assets to satisfy that judgment unless Arriba showed that the juridical separateness of Pemex as a government instrumentality should not be respected. The district court therefore found Arriba's attempt to garnish Pemex solely because Pemex was allegedly indebted to some or all of the private defendants to be meritless. However, Arriba's garnishment claim was not dismissed in its entirety because the district court ultimately ordered additional discovery on the question of Pemex's juridical separateness, an issue which we discuss below.

APPELLATE JURISDICTION

We have jurisdiction to hear this appeal. This court has recently decided that the interlocutory denial of a claim of foreign sovereign immunity is appealable under the collateral order doctrine. *Stena Rederi AB v. Comision de Contratos,* 923 F.2d 380, 385–86 (5th Cir.1991). Arriba contends, however, that the district court's partial dismissal of its earlier garnishment claim was not timely appealed by Pemex. This is true, although in light of *Stena* and the following discussion, our refusal to consider that minor aspect of Pemex's appeal yields Arriba a Pyrrhic victory. *See Stena,* 923 F.2d at 391–93 (garnishment immunity is subject to principles of FSIA).


III.

JURISDICTION UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT

The FSIA sets forth "the sole and exclusive standards to be used" to resolve all sovereign immunity issues raised in federal and state courts. *See* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 12 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6604, 6610. While the FSIA recognizes the general rule that foreign states are entitled to immunity from jurisdiction in American courts, § 1605 codifies several exceptions to that rule. Arriba principally invokes the "commercial activities" exception, which provides that foreign states are not immune from suit in U.S. courts when the action is based on commercial activity that has a jurisdictional nexus with the United States. 28 U.S.C. § 1605(a)(1)–(2). That Pemex is a foreign government instrumentality is undisputed. *See Stena,* 923 F.2d at 386. As defined in the Act, the term "commercial activity"

> means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d). The drafters of the FSIA envisioned that the courts "would have a great deal of latitude in determining what is a "commercial activity' for purposes of this bill." House Report at 16 U.S.Code Cong. & Admin.News 1976, at 6615. However, in listing possible examples of "particular transactions or acts" which might fall within the exception, the House Judiciary Committee

specifically included "a single contract, if of the same character as a contract which might be made by a private person." *Id.* Arriba maintains that if attributable to Pemex, the 1984 Agreement constitutes commercial activity within the meaning of the statute. *See Stena,* 923 F.2d at 387 n. 9.

Nonetheless, merely showing that a foreign state or its instrumentality has engaged in "commercial activities" within the meaning of the Act is not sufficient: only those commercial activities with a sufficient "jurisdictional nexus" to the United States fall within the exception. *See Stena,* 923 F.2d at 386. Section 1605(a)(2) identifies three types of actions that are sufficiently connected to the United States to satisfy the jurisdictional nexus requirement:

> (1) a commercial activity carried on in the United States;
>
> (2) an act performed in the United States in connection with a commercial activity carried on outside the United States; or
>
> (3) a commercial activity carried on outside the United States that has a direct effect in the United States.

*Id.*

Section 1605(a)(2) also requires that there be a material connection between the plaintiff's cause of action and the commercial acts of the foreign sovereign. *Stena, id.* at 386–87. Thus, "[i]n order to satisfy the commercial activities exception to sovereign immunity, the commercial activity that provides the jurisdictional nexus with the United States must also be the activity on which the lawsuit is based." *Id.* at 387. Isolated or unrelated commercial actions by a foreign sovereign in the United States do not authorize the exception. *Id. See also De Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1391 (5th Cir.1985).

The parties vigorously dispute their respective burdens of proof on the commercial activity issue, yet case law resolves such questions almost uniformly. Once the defendant alleges that it is a "foreign state", the plaintiff must produce some facts to show that the commercial activity exception

to immunity applies, but the defendant retains the ultimate burden of proof on immunity. *Stena,* 923 F.2d at 390 n. 14; *Forsythe v. Saudi Arabian Airlines Corp.,* 885 F.2d 285, 289 n. 6 (5th Cir.1989). There is an exception to this general rule. Foreign instrumentalities and agencies are accorded a presumption of independent status. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 626–27, 103 S.Ct. 2591, 2599–2600, 77 L.Ed.2d 46 (1983) ("*Bancec* "). Although *Bancec* 's description of the basis for disregarding the separate juridical status of foreign agencies occurred in a discussion of substantive liability, its principles have been applied to FSIA jurisdictional issues. *See Foremost–McKesson, Inc. v. The Islamic Republic of Iran,* 905 F.2d 438, 446 (D.C.Cir.1990); *Hester Int'l Corp. v. Federal Republic of Nigeria,* 879 F.2d 170, 176 (5th Cir.1989). Hence, where, as here, jurisdiction depends on an allegation that the particular defendant was an agent of the sovereign, the plaintiff bears the burden of proving this relationship. *Foremost–McKesson, Inc.,* 905 F.2d at 447; *Hester,* 879 F.2d at 176.[8]

Arriba contends that, having alleged jurisdiction under the commercial activity exception, it is entitled to pursue discovery to support its allegations. *See, e.g., Filus v. Lot Polish Airlines,* 907 F.2d 1328, 1332–33 (2d Cir.1990); *Foremost–McKesson, Inc.,* 905 F.2d 448–49; *Gould, Inc. v. Pechiney Ugine Kuhlmann,* 853 F.2d 445, 451–52 (6th Cir.1988), *cert. dismissed, Pechiney and Trefimetaux v. Gould, Inc.,* ––– U.S. ––––, 112 S.Ct. 1657, ––– L.Ed.2d ––– (1992). The district court agreed, drawing an analogy to the usual procedure for resolving contested jurisdictional issues. *See, e.g., DeMelo v. Toche Marine, Inc.,* 711 F.2d 1260, 1270–71 and n. 12 (5th Cir.1983); *C. Wright & A. Miller,* Federal Practice & Procedure § 1350. The court was enticed into its discovery order prematurely, however. Several courts have observed the tension between permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or sovereign agency's legitimate claim to immunity from discovery. The potential conflict is not unlike that attendant to claims that challenge domestic government officials' qualified immunity from suit.

---

[8]The district court erred in apparently saddling Pemex with the burden of proving it is not an agent or alter ego of the Union and the Commission.

*See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). At the very least, discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination. A necessary prerequisite to an order for limited discovery is a district court's clear understanding of the plaintiff's claims against a sovereign entity. It is at this first step that the district court stumbled.

Carefully read, Arriba's pleadings allege much less than they imply in the way of "commercial activity" by or on behalf of Pemex. To be sure, Arriba has alleged a breathtakingly bold theory according to which Pemex, its labor union, and the Commission—juridically separate entities—combined to effect sales of Mexican government‑owned residual oil "off the books" of Pemex and into Arriba's tanks at a much-reduced price. Presumably the goal of this alleged arrangement was to enrich the officials wily and corrupt enough to have concocted this rogues' bargain that depended for all practical purposes upon the theft of Mexico's oil products. But under § 1605(a)(2), Arriba first has to plead how Pemex achieved the jurisdictional nexus necessary to support subject matter jurisdiction in this country. Arriba has failed to allege a single Pemex activity in or directly affecting the United States. It bears repeating that the 1984 agreement was structured so as to avoid any direct dealings with Pemex, and that while the Agreement was allegedly executed in Texas, Pemex was not a party to it.[9] Arriba has not alleged that Pemex negotiated, participated or contracted with it directly in any way. The fact that Pemex has some commercial operations in or affecting the United States is inadequate to support a finding of subject matter jurisdiction under the FSIA. "The only relevant acts for purposes of jurisdiction under the FSIA are those acts that form the basis of the plaintiff's complaint." *Stena,* 923 F.2d at 387–888.

The only alleged connection between Pemex and Arriba in the United States relevant to this

---

[9]Arriba did not seek to rest jurisdiction on § 1605(a)(3) of the FSIA, possibly because it could be contended that Arriba's alleged financial losses alone are irrelevant to measuring the effect of any commercial activities on the United States because Arriba is a Bahamian corporation. *Stena,* 923 F.2d at 390.

case (and hence "material" under *Stena, id.* at 387) arises from the Commission's status as an agent or alter ego of the Union and Pemex. Arriba insists that the Supreme Court's decision in *Bancec* supports finding jurisdiction predicated upon the attribution to Pemex of acts by the Commission and the Union. We wholeheartedly disagree that Arriba's theory of attribution is *Bancec*'s theory.

In *Bancec,* an official autonomous credit institution of the Cuban government sued First National (subsequently known as "Citibank") to recover an unpaid letter of credit. Bancec had been established as a separate juridical entity in 1960, with powers to hold and sell property and to sue and be sued. After the Cuban revolution, however, Bancec was dissolved and its capital was split between two government agencies. Citibank counterclaimed, asserting a right to set off the value of its seized Cuban assets. At issue on appeal was whether Bancec's claim was subject to setoff for the debts of its parent government. Answering in the affirmative, the Court held that while duly created instrumentalities of a foreign state are to be accorded a presumption of independent status, the presumption of judicial separateness may be overcome when "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created." *Id.,* 462 U.S. at 629, 103 S.Ct. at 2601. Cuba therefore could not escape liability for violations of international law simply by retransferring assets to separate juridical entities. The Court found it inequitable to permit Cuba to sue on a claim in an American court while ignoring its obligations under international law. *Id.* at 630–34, 103 S.Ct. at 2602–04.

*Bancec* is inapposite to this case. First, the concept of piercing the corporate veil, or alter ego liability, that underlies *Bancec* involves the disregard of corporate status to reach the assets of the owners or of related corporate entities. *See, e.g., Hester,* 879 F.2d 177–78 and n. 7. No such facts are pleaded here. Arriba wants the federal court to disregard the Commission's separate status by lumping it with an entirely distinct entity: the Union's employer, Pemex. There is neither common

ownership nor any similar legal relationship between these entities.[10] One cannot pierce a non-existent corporate veil. What Arriba seeks is more properly characterized as joint and several liability for conspiracy or tort, respondeat superior,[11] or agency liability.

Second, Arriba's agency theory is deficient. Just as *Bancec* "freely drew from American corporate law regarding the circumstances in which a corporation could be held not to be a separate entity from its owners," *Hester,* 879 F.2d at 177, these same concepts lead us to reject Arriba's claims that the private defendants were "agents" and "alter egos" of Pemex.[12] Arriba has failed to allege any manifestations *by* Pemex, the alleged "principal" in this agency relationship, that the private defendants could act *for* Pemex. It is undisputed that Pemex was not a party to the 1984 agreement

---

[10]In *Bancec,* both of the agencies that received assets of the former bank were government instrumentalities. Here, only Pemex is a sovereign entity. The Commission is the private contracting arm of the Union, which is itself a private entity.

[11]Arriba did not plead conspiracy or tort as a basis for FSIA jurisdiction, *see* 28 U.S.C. § 1605(a)(5) (FSIA exception to immunity for tort liability). Likewise, it cannot rest on respondeat superior, inasmuch as it asserts that the Commission's activities were outside the course and scope of employment with Pemex. No further discussion of these issues is warranted.

[12]*Bancec* "specifically declined to apply the law of the chartering state to determine the separate juridical status of its instrumentality." *Hester,* 879 F.2d at 177. It may seem incongruous for U.S. courts to import concepts from American corporate law to define the relationships between foreign governments and their instrumentalities, rather than to apply traditional choice of law principles. Indeed, one commentator has criticized this approach:

> Without exception the United States cases ... have applied the United States theory of veil piercing to determine the relationship of the foreign government and the instrumentality. The courts have not even addressed the choice of law as a possible issue. The law of the forum has been less a choice and more an application without acknowledgement that a choice existed.

MICHAEL WALLACE GORDON, FOREIGN STATE IMMUNITY IN COMMERCIAL TRANSACTIONS § 6.18 at 6–46 (1991) [hereinafter "GORDON"]. However, the Court did qualify its holding in two important respects. First, *Bancec* warned against an overly mechanical application of American corporate law principles. 462 U.S. at 633–34, 103 S.Ct. at 2603. The Court did not presume to create "an exhaustive list of criteria for disregarding the corporate form of other sovereign states' instrumentalities." *Hester,* 879 F.2d at 178. More fundamentally, the Court justified its result as "the product of the application of internationally recognized equitable principles to avoid the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law." *Bancec, id.,* 462 U.S. at 633–34, 103 S.Ct. at 2603.

with Arriba. Quinones purported to represent only the Commission, and not the Union or Pemex, when he signed the Agreement. Arriba's insistence that corruption in the Mexican oil industry continued despite President de la Madrid's "moral renovation" campaign, rendering moot the question of illegality under Mexican law, only undermines its assertion that an agency relationship existed between Pemex and the private defendants.

Arriba also pleads that while Union and Pemex officials represented informally to Arriba that they could arrange for Pemex to deliver substantial volumes of residual oil, "[n]one of those representations were true." This is a far cry from domestic agency principles, which require "some manifestations, written or spoken words or conduct, *by the principal,* communicated either to the agent (actual authority) or to the third party (apparent authority)." *Hester,* 879 F.2d at 181.[13] Yet there is here no allegation that Pemex, the "principal," participated in any of the negotiations leading to the Agreement or stated that any of the private defendants represented Pemex. The bottom line is that Arriba's pleadings reflect the *antithesis* of agency liability. Arriba cannot have it both ways. Having structured a transaction to avoid dealing with Pemex directly, it cannot now allege that Pemex is responsible for the acts of private parties who misrepresented their authority to act on Pemex's behalf.[14]

There is a third distinction between this case and *Bancec. Bancec* emphasizes "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity between nations". 103 S.Ct. at 2600, citing *Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895). The *Bancec* Court expressed the concern that freely ignoring the separate status of government

---

[13]*Hester* quotes *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 493 (5th Cir.1974), *overruled on other grounds, Insurance Corporation of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702–03, 102 S.Ct. 2099, 2104–05, 72 L.Ed.2d 492 (1982), *as stated in Burstein v. State Bar of California,* 693 F.2d 511, 518 n. 12 (5th Cir.1982) (emphasis added).

[14]It is true that in *Hester* the flaw in the plaintiff's agency theory of liability against the Nigerian government was determined after trial. 879 F.2d at 181. But Arriba's conclusory allegations of an agency relationship are contradictory to the facts it pleads, which assert a *misrepresentation* of the private defendants' ability to bind Pemex.

instrumentalities could cause uncertainty over the extent of their liabilities and inhibit their ability to obtain credit. Hence, the separate corporate status of such entities should be disregarded only where necessary to do equity. We would be remiss not to point out that equity is not served by holding Pemex accountable in American courts on the broad but vague attribution theory alleged by Arriba. Not only does Arriba's theory fail to conform to the standard articulation of piercing the corporate veil, but it cannot be proved without massive, intrusive discovery in Mexico on highly sensitive domestic issues.[15] We would not allow such generalized conspiratorial allegations against an American government entity to provoke massive discovery. *See, e.g., Elliott v. Perez,* 751 F.2d 1472 (5th Cir.1985); and *Jacquez v. Procunier,* 801 F.2d 789 (5th Cir.1986) (vague allegations of conspiracy). It is unimaginable that FSIA would authorize broader exposure to suit of a foreign government instrumentality such as Pemex than that of domestic governmental units.

For these reasons, we hold that Arriba has not alleged commercial activities by or on behalf of Pemex, related to the Agreement, that subject it to jurisdiction in this country. While *Bancec* would permit FSIA jurisdiction in American courts over a commercial activity predicated upon principal-agent or veil-piercing allegations against a foreign sovereign instrumentality, *see Hester,* 879 F.2d at 181, Arriba's allegations do not meet the *Bancec* test. Fairly read, they are self-contradictory on the possibility of a principal-agent relationship between Pemex and the Commission or the Union, and they do not conform to the internationally recognized principles authorizing, under limited circumstances, disregard of corporate status. *Cf. Bancec,* 462 U.S. at 633–34, 103 S.Ct. at 2603.

---

[15]Arriba's discovery requests in the district court prove this point. They include: (1) requests for all Pemex financial reports, balance sheets and income statements, including those of Pemex's subsidiaries and affiliates; (2) all documents reflecting communications between Pemex and the private defendants, ranging from formal documents to internal memoranda; (3) all documents reflecting any payments or transfers of funds from Pemex, any vendor of Pemex, or any officer or director of Pemex, to the private defendants; (4) all documents in Pemex's possession reflecting communications between any of the private defendants—or persons associated with them—and Pemex or its vendors; (5) all documents relating to any assets of the private defendants; (6) all documents referring to any of the activities of the private defendants; and (7) all documents referring to any investigations of the private defendants by Pemex for any alleged misconduct, including bribery, extortion, ultra vires acts, tax evasion, embezzlement and any other possible violations of U.S. or Mexican law.

Judicial comity among nations, an important principle acknowledged in *Bancec,* has become increasingly important to today's global economy. Flouting comity, Arriba's *JFK*-like[16] charges against the defendants, if pursued in American courts, could seriously impede our relations with Mexico. Finally, because Arriba's allegations do not satisfy *Bancec,* permitting discovery will not cure the FSIA jurisdictional deficiency.[17] The allegations made by Arriba do not confer jurisdiction over Pemex consistent with FSIA.

## IV.

## IMPLIED WAIVER OF SOVEREIGN IMMUNITY UNDER FSIA

---

[16]Oliver Stone's recent movie *JFK* hypothesizes that President Kennedy was assassinated by a massive conspiracy including the CIA, FBI, the U.S. military-industrial complex, and various other government officials and businessmen.

[17]Arriba incorrectly relies on cases that have allowed limited discovery before the court rules on whether a foreign sovereign's commercial activities deprive it of immunity. In each of these cases, there were allegations of *specific facts* that, if proved, sustained a nexus between particularized commercial activity and the claims asserted by the plaintiff. The theft of trade secrets by a French government-owned company and its subsidiary was alleged in *Gould* to have been accomplished partly through negotiations in the United States with Gould's former employee. The court ordered limited discovery to ascertain that such actions, sufficient in its view to establish FSIA jurisdiction, had occurred. *Gould,* 853 F.2d at 453. In *Gilson,* allegations were made by an American plaintiff against the Republic of Ireland and companies owned by it that these defendants enticed him to go to Ireland to work for them and then stole his patent rights and expertise for their own benefit. *Gilson v. Republic of Ireland,* 682 F.2d 1022 (D.C.Cir.1982). Whether or not a Soviet entity negligently overhauled a Polish aircraft in the United States, contributing to its crash later in Poland, and whether two Soviet entities were separate, provided the only two fact issues pertaining to the commercial activities exception to FSIA in *Filus v. Lot Polish Airlines,* 907 F.2d at 1332–33. Finally, *Foremost–McKesson* permitted inquiry into whether the Iranian government's majority control of a dairy company in Iran was sufficient to establish a principal-agent relationship under the FSIA. 905 F.2d at 447.

There was alleged to be direct involvement by the foreign sovereign instrumentality in the commercial activity from which all of the foregoing claims arose. Liability was sought against the sovereign defendant on account of specific misdeeds. Arriba's allegations, as we have emphasized, posit no direct involvement of Pemex in its contract. Its complaint relies on speculative inferences of behind-the-scenes activity by Pemex and, through its novel use of corporate attribution theory, would hold Pemex liable for the Union's and the Commission's misdeeds. Limited jurisdictional discovery, consonant with the comity envisioned by FSIA, (*See Gould,* 853 F.2d at 451; *Foremost,* 905 F.2d at 446–47 is impossible under these allegations, because they are much broader than the basic claim of breach of the 1984 Agreement. As the other FSIA cases demonstrate, discovery may be used to confirm specific facts that have been pleaded as a basis for enforcing the commercial activities exception, but it cannot supplant the pleader's duty to state those facts at the outset of the case. *Stena,* 923 F.2d at 386–87.

As another basis for jurisdiction under the FSIA, Arriba urges that Pemex implicitly waived its sovereign immunity, a possibility authorized by § 1605(a)(1). It goes nearly without saying that Pemex has not expressly waived immunity.

The gist of Arriba's implied waiver theory is as follows: Article 17 of the Organic Law of Petroleos Mexicanos, Pemex's enabling legislation, is the equivalent of a corporate charter. Article 17 permits Pemex "to sue and be sued."[18] A long line of Supreme Court decisions, beginning with *Bank of the United States v. Planters' Bank of Georgia,* 9 Wheat. (22 U.S.) 904, 6 L.Ed. 244 (1824), have construed the "sue and be sued" provisions in corporate charters to be a waiver of sovereign immunity. Thus, Arriba argues, Article 17 amounts to an implied waiver of Pemex's sovereign immunity.

If adopted, Arriba's imaginative "sue and be sued" theory of implied waiver would presumably deny Pemex sovereign immunity in most if not all future actions to which it is a party. We decline to adopt the theory.[19] As Chief Justice Marshall noted in *Osborn v. Bank of the United States,* 9 Wheat. (22 U.S.) 738, 6 L.Ed. 204 (1824), the companion case to *Planter's Bank,* the legislation which created the Bank of the United States empowered it "to sue and be sued, plead and be impleaded, answer and be answered, defend and be defended, in all state courts having competent

---

[18]These are Arriba's words; the phrase "sue or be sued" does not actually appear in Article 17, which provides that Mexico's federal courts have exclusive jurisdiction over all cases and controversies to which Pemex is a party.

[19]According to Professor Gordon, the argument that endowing a state entity with the capacity to sue and be sued constitutes an implicit waiver of sovereign immunity is "easily rejected." GORDON § 9.04 at 9–9 (citing *Dayton v. Czechoslovak Socialist Republic,* 672 F.Supp. 7 (D.D.C.1986), *affirmed,* 834 F.2d 203 (D.C.Cir.1987), *cert. denied,* 486 U.S. 1054, 108 S.Ct. 2820, 100 L.Ed.2d 921 (1988)). Section 1604 of the Act extends sovereign immunity not just to the governments of foreign states, but to their agencies and instrumentalities. Observing that the legislative history to § 1603(b) defines "agency or instrumentality" to include any entity which, "under the law of the foreign state where it was created, can sue or be sued in its own name," *Dayton* held that such entities are covered by § 1604. *Id.* at 10–11.

jurisdiction, and in any circuit court of the United States."[20]  But *Planter's Bank* has no bearing on the issue of whether *foreign* sovereigns are immune from suit in the courts of the United States.  The case, which settled a lingering dispute over the powers of the Bank of the United States, held that the "sue and be sued" language in the Bank's charter gave it the right to sue in federal court as the bearer of negotiable instruments made by a state bank.  *Planter's Bank* turned on whether Congress had conferred federal question jurisdiction on the Bank, not whether the particular words "sue and be sued" amounted to a waiver of the Bank's sovereign immunity as a federally chartered institution.[21]

Nor is *Bancec* helpful to Arriba.  Arriba refers to an isolated passage in *Bancec* in which the Court, citing *Planter's Bank,* noted that "[p]rovisions in the corporate charter stating that the instrumentality may sue and be sued have been construed to waive the sovereign immunity accorded to many governmental activities, thereby enabling third parties to deal with the instrumentality knowing that they may seek relief in the courts."  462 U.S. at 625, 103 S.Ct. at 2599.  In this particular context, however, the "waiver" of sovereign immunity referred to the Cuban government's willingness to allow *some* judicial remedies against the bank, as opposed to the more specific question of whether Bancec should be exposed to the subject matter jurisdiction of courts in the United States. To the extent that Article 17 provides that Pemex may be sued, it amounts to a waiver of Mexico's sovereign immunity within the meaning of the above-quoted passage in *Bancec.*  But Article 17 also gives Mexican courts exclusive jurisdiction over all controversies to which Pemex is a party.

---

[20]*See generally* P. BATOR, D. MELTZER, P. MISHKIN & D. SHAPIRO, HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 967–84 (3d ed. 1988).

[21]*Planter's Bank* and *Osborn* did not address sovereign immunity within the context of international law.  Recently, however, the Court in *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), raised the question whether the FSIA is unconstitutional to the extent that it permits the federal courts to entertain substantive claims that are not based on federal law.  Relying on *Osborn,* the Court held that the phrase "arising under the laws of the United States" in Article III is sufficiently broad to entitle Congress to "confer on the federal courts jurisdiction over any case or controversy that *might* call for the application of federal law."  *Id.* at 492, 103 S.Ct. at 1971 (emphasis added).  Defining the scope of federal question jurisdiction cannot answer the separate question whether Pemex's charter amounts to an implied waiver of its immunity from suit in U.S. courts.

Consequently, Pemex's enabling legislation, without more, is hardly a waiver of its sovereign immunity within the menaing of the FSIA.[22]

## V.

## CONCLUSION

In view of our holding that the district court lacks subject matter jurisdiction over this dispute, it is unnecessary to decide whether Arriba's action against Pemex is barred by the Act of State doctrine. For all the foregoing reasons, the judgment of the district court is REVERSED with instructions to DISMISS with prejudice; the Act of state interlocutory appeal is DISMISSED as moot.

Case No. 91–2180—REVERSED with INSTRUCTIONS to DISMISS with PREJUDICE.

Case No. 91–6311—DISMISSED AS MOOT.

---

[22]According to the House Report that accompanied the FSIA, implicit waivers are ordinarily found in three situations: (1) a foreign state agrees to arbitration in another country; (2) the foreign state agrees that a contract is governed by the laws of a particular country; and (3) the state files a responsive pleading without raising the immunity defense. *See* H.R.Rep. No. 1487, 94th Cong., 2d Sess. at 18. *See also* GORDON § 9.04 at 9–10. None of these situations is present here.