Renato E. CORZO; DC Ltd.,
Plaintiffs–Appellants,

v.

**BANCO CENTRAL DE RESERVA DEL PERU, Defendant– Appellee.**

No. 00–55084.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 2001

Filed March 12, 2001

Vincent B. Moneymaker, Law Firm of Richard M. Moneymaker, Los Angeles, California, for the plaintiffs-appellants.

Daniel S. Floyd, Gibson, Dunn & Crutcher LLP, Los Angeles, California, for the defendant-appellee.

Before: LEAVY, TROTT, and SILVERMAN, Circuit Judges.

Opinion Judge TROTT; Concurrence by Judge SILVERMAN

TROTT, Circuit Judge:

Plaintiffs Renato Corzo and DC Ltd. (collectively, "Corzo") appeal the judgment of the district court dismissing their case against the Banco Central de Reserva del Peru ("the BCRP") for lack of jurisdiction. The district judge determined that, as an arm of the Peruvian government, the BCRP was presumptively entitled to sovereign immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602–1611 ("the FSIA"), and that none of the FSIA's exceptions to sovereign immunity were applicable. The district court accordingly dismissed the case for lack of jurisdiction.

We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We agree with the district court's decision, and therefore AFFIRM.

## BACKGROUND

This case arises out of a lawsuit brought in Peru by Novotec S.A. ("Novotec"), Corzo's predecessor in interest, against the BCRP. Novotec is a Peruvian company that assembles and exports computers made largely from components imported from the United States. The BCRP is the monetary authority of Peru. The parties agree that it is an arm of the Peruvian government presumptively immune from suit in the United States unless jurisdiction lies under one of the FSIA's exceptions to foreign sovereign immunity.

Before the Peruvian lawsuit, Novotec and the BCRP had a longstanding commercial relationship, with much of the money for Novotec's operations coming from the so-called "FENT Fund," a line of credit which the BCRP had established to foster nontraditional Peruvian industries. However, the underlying lawsuit in this case had nothing to do with the FENT Fund. Rather, it was based on the BCRP's denial in 1989 of an application for compensation for losses Novotec had suffered when the exchange rate between Peruvian and U.S. currency shifted unfavorably. Because Novotec exported goods assembled from imported components, it suffered significant losses when the value of Peruvian currency declined between the time it purchased the imported components and the time it exported the completed goods. Recognizing that the devaluation of Peru's money adversely affected companies such as Novotec, the BCRP in 1988 instituted a policy by which exporters who suffered exchange rate related losses could apply to receive compensation. If the BCRP granted an application for exchange rate compensation, the exporter would receive the difference between the price paid for the imported goods and the price received for the exports.

This policy, however, lasted less than a year. Just one month before it was discontinued, Novotec submitted an application for compensation, claiming that it had lost nearly $400,000 from April to November of 1988 as a result of exchange rate fluctuations. The BCRP denied Novotec's application. Novotec then sued the BCRP in Peru, seeking recovery of the original compensation it had been denied, plus interest and damages. Novotec prevailed in a Peruvian trial court, and the case made its way through the Peruvian appellate system. Eventually, the case reached the Supreme Court of Peru, which affirmed the judgment in favor of Novotec on May 14, 1997.

After the Supreme Court had affirmed the judgment, Novotec assigned its interest in it to Corzo. However, this transaction turned out to be a particularly bad deal for Corzo, because on January 16, 1998, the Peruvian Supreme Court declared its previous judgment in favor of Novotec "null and void." The court indi-

cated first that it thought that the BCRP had been denied due process. It also issued the admittedly perplexing explanation that the original judgment had been issued "by mistake, without the justices having been aware that the document they were signing included a decision with the opposite outcome they wished for that judgment."

According to Corzo's experts, the Peruvian Supreme Court's "King's X" was unprecedented and extra-legal under Peruvian law. The court's actions also apparently caused quite a scandal in the Peruvian government, as is evidenced by a document in the record called a "Resolution of the National Council of the Judiciary." This Resolution alleged that the justices of the Peruvian Supreme Court had "committed a grave act that compromises the dignity of their post and demerits the exercise of their position by the fact that they have issued a fraudulent judgment," and called for "disciplinary sanctions" and "eventual penal responsibility" for the "presumed commission of the crime of prevarication."

Despite this outcry, the drama in Peru apparently did not play out to Corzo's liking, because in March of 1999, he filed a "Complaint to Domesticate a Foreign Judgment" in United States District Court in Los Angeles, California. The complaint alleged that Novotec, and therefore Corzo, had a valid and final judgment against the BCRP in Peru, and sought to attach the BCRP's assets in the United States. The BCRP objected, claiming it was immune from suit under the FSIA, and that the district court therefore had no jurisdiction over it. After extensive briefing and a hearing, the district judge concluded that the BCRP was in fact entitled to sovereign immunity and dismissed the case for lack of jurisdiction. Corzo now appeals, claiming that jurisdiction lies under the (1) "waiver" and (2) "commercial activity" exceptions to foreign sovereign immunity, and also that comity requires us to enforce the judgment of the courts of Peru. We reject these arguments for the reasons discussed below.

## DISCUSSION

The FSIA provides the sole means by which courts of the United States can assert jurisdiction over foreign sovereigns. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 354, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). The Act conflates the usually distinct questions of sovereign immunity, subject matter jurisdiction, and personal jurisdiction. *See, e.g., Randolph v. Budget Rent–A–Car*, 97 F.3d 319, 323 (9th Cir.1996). Jurisdiction exists only if immunity does not. *See id.* Under the FSIA, foreign sovereigns are presumptively immune from suit in the United States, unless one of several exceptions applies. 28 U.S.C. § 1604. The existence of sovereign immunity and subject matter jurisdiction under the FSIA are questions of law which we review *de novo*. *Budget Rent–A–Car*, 97 F.3d at 323.

### A. Waiver

The FSIA's waiver exception reads as follows:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver.

28 U.S.C. § 1605(a)(1). Corzo argues that the BCRP has either expressly or impliedly waived its immunity from suit in the United States. To support his claim that the BCRP has explicitly waived its sovereign immunity, Corzo submitted several expert opinions which concluded that, under the Peruvian Constitution and the BCRP's own Organic Law, the BCRP was not immune from suit. In support of his implied waiver argument, Corzo argues

that the BCRP's submission to litigation in Peru constitutes an implied waiver of any sovereign immunity it may have had with respect to this case, including immunity from suit in the United States. Because both the explicit and implicit waiver arguments are based on the same faulty premise, they can be discussed, and rejected, at the same time.

The district court rejected Corzo's waiver arguments, concluding that "submission of a foreign sovereign to its own courts or the courts of nations other than the United States does not by itself evidence an intent by the foreign sovereign to waive its immunity from suit in the United States." Corzo, on the other hand, argues that the FSIA was intended to recognize only that immunity which a foreign sovereign enjoys in its home country, and that the district judge's failure to recognize this principle created a "false dichotomy." We agree with the district court. While Corzo's argument has some appeal at first blush, the relevant case law, as well as the structure, purpose, and legislative history of the FSIA all indicate that it is wrong.

The precise issue presented by this case—whether a sovereign's amenability to suit in the courts of its own country automatically subjects it to jurisdiction in the United States—is one of first impression in this circuit. However, we have repeatedly stated that the waiver exception to sovereign immunity must be narrowly construed. See, e.g., Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 720–21 (9th Cir.1992). We have also stated that a foreign sovereign cannot be sued in the United States unless it could have contemplated that its actions would subject it to suit here. See id. at 721. It is difficult to see how the BCRP could have contemplated that a run-of-the-mill lawsuit in Peru could result in its having to litigate in the United States.

Additionally, several courts have addressed the question of whether amenability to suit in one country automatically subjects a foreign sovereign to jurisdiction

here, and have uniformly concluded that it does not. For example, in *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 538 (5th Cir.1992), the Fifth Circuit rejected the notion that a provision in a sovereign entity's corporate charter stating that it could "sue and be sued" implied a waiver of sovereign immunity in United States courts. In addition, the Eighth and Seventh Circuits, as well as several district courts, have held that a waiver of sovereign immunity in domestic courts does not by itself evidence an intent on the part of the sovereign entity to waive immunity from suit in the United States. *See General Elec. Capital Corp. v. Grossman*, 991 F.2d 1376, 1386 (8th Cir.1993); *Frolova v. U.S.S.R.*, 761 F.2d 370, 377 (7th Cir.1985); *Eaglet Corp. Ltd. v. Banco Central De Nicaragua*, 839 F.Supp. 232, 234–36 (S.D.N.Y.1993), *aff'd.* 23 F.3d 641 (2d Cir. 1994); *Intercontinental Dictionary Series v. DeGruyter*, 822 F.Supp. 662, 679 (C.D.Cal.1993); *Dayton v. Czechoslovak Socialist Republic*, 672 F.Supp. 7, 10–11 (D.D.C.1986).

In addition to this authority, the House Report on the FSIA states that agencies or instrumentalities of foreign states which are entitled to immunity include "a corporation, association, foundation, or any other entity which, under the law of the foreign state where it was created, can sue or be sued in its own name." H.R. Rep. No. 1487 at 15 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6613–14. This language strongly suggests that while an entity may be amenable to suit in its home country under some circumstances, it does not necessarily follow that it lacks sovereign immunity from suit in the United States. Finally, the fact that the FSIA encompasses not only the concept of subject matter jurisdiction, but also that of personal jurisdiction, brings home the weakness of Corzo's argument. Submitting to jurisdiction in the courts of one nation should in no way put a foreign sovereign on notice that it has thereby

subjected itself to personal jurisdiction in the United States.

■ In light of the foregoing discussion, it is legally irrelevant that the BCRP may have explicitly or impliedly waived its sovereign immunity in Peruvian courts. Corzo has presented no evidence that the BCRP has either explicitly or impliedly waived its sovereign immunity from suit in the United States. For these reasons, we affirm the district court's decision that a sovereign entity's waiver of immunity in its home country has nothing to do with whether it has waived immunity from suit in the United States.

## B. The "Commercial Activity" Exceptions

In addition to the waiver exceptions discussed above, the FSIA also provides that foreign sovereigns will not be immune to suit in the United States for actions which are based upon certain commercial activities. Section 1605(a)(2), which describes this "commercial activity" exception, actually provides for three distinct exclusions from immunity in cases in which:

> [1] the action is based upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Corzo argues that the first and third of these exceptions are applicable to his complaint against the BCRP. We reject his arguments.

### 1. The First Commercial Activity Exception

■ Corzo first argues that his action to domesticate the judgment is "based upon a commercial activity carried on in the United States by a foreign sovereign" under the first of the commercial activity exceptions. The "activity" he points to is the BCRP's ownership of assets in the United States. His action is "based upon" this activity, Corzo argues, because he is seeking to attach those assets. This argument is not persuasive. A plaintiff must do more than say "the foreign sovereign has assets here, and I want them" to avail himself of the commercial activity exception. The FSIA was designed to strike a balance between the interests of foreign governments and the rights of plaintiffs, not to obliterate principles of comity and sovereign immunity.

### 2. The Third Commercial Activity Exception

Corzo attempts to take advantage also of the third clause of § 1605(a)(2), claiming that his action is "based upon ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). This argument fails, because the relevant BCRP activity was not commercial and caused at best an indirect effect in the United States.

#### a. Commercial Activity

As a threshold matter, we must determine what activity gave rise to the present suit, in order to decide whether it is "based on" commercial activity of the BCRP. Although the parties disagree on this point, we will assume for the sake of argument that the fact that Corzo is Novotec's successor in interest would allow him to enforce the underlying judgment in exactly the same manner as Novotec could, and that therefore, the relevant BCRP activity is that which gave rise to the original lawsuit in Peru. Second, while Novotec and the BCRP did engage in numerous commercial transactions, Corzo's own expert stated that the underlying litigation arose when Novotec sought "payment of [its] claim for compensation under [the] Exchange Rate ruling, and ... damages based on the BCRP's denial of [its] claim."

Therefore, it is clear that the underlying lawsuit had nothing to do with the FENT Fund or any line of credit, and everything to do with the denial of the application for exchange-rate compensation. The difference is critical, because the denial of the exchange-rate application was not commercial activity, but a sovereign act.

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to the purpose." 28 U.S.C. § 1602(d). The Supreme Court has refined this rather opaque definition, stating that "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). The Court went on to state: "the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce." *See id.* (internal quotations omitted).

■ In light of the Supreme Court's holding in *Weltover*, the BCRP's act of granting or denying exchange rate compensation is clearly a sovereign activity, and it is therefore not subject to suit in the United States on this particular claim. A private party does not have the power to regulate currency exchange rates. *See Weltover*, 504 U.S. at 614, 112 S.Ct. 2160 ("A foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party"). Nor do private financial institutions normally compensate businesses for the losses they sustain due to fluctuating exchange rates. The BCRP's policy of granting exchange rate compensation was more akin to a subsidy than an arms-length commercial transaction, and as such, it was a sovereign act. It would be unthinkable for a citizen of this country to sue the United States government in Peruvian court, alleging that he had been illegally denied, for example, welfare benefits or a farming subsidy. Corzo's request that United States courts assert jurisdiction over the BCRP is unconvincing.

### b.  Direct Effect

■ Because we have concluded that the relevant activity was not commercial in nature, a determination of whether that activity had a "direct effect" in the United States is not critical to the outcome of this case. We do note, however, that Corzo's argument that the BCRP's activity had a direct effect in the United States is extremely tenuous. In a nutshell, Corzo argues that the BCRP's refusal to pay exchange-rate compensation caused a cutoff of cash-flow which forced Notovtec to breach contracts with computer companies in the United States, and claims that the effect on U.S. companies was "direct" for purposes of the third commercial activity exception.

Corzo's argument fails. The ill-effects suffered by companies in the United States as a result of Novotec's contract breaches did not follow "as an immediate consequence of [the BCRP's] activity," *Weltover*, 504 U.S. at 618, 112 S.Ct. 2160; rather, they were at best secondary or incidental results of the BCRP's actions. *See, e.g. Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 726–27 (9th Cir.1997) (holding that mere financial loss in the United States does not constitute a direct effect); *Australian Govt. Aircraft Factories v. Lynne*, 743 F.2d 672, 673–75 (9th Cir.1984) (concluding that where American was killed in an airplane crash abroad, losses suffered by his family members in the United States as a result of his death were not direct effects for purposes of the FSIA).

■ Additionally, the FSIA requires a nexus between the activity of the

**526**

foreign sovereign and the plaintiff's cause of action. *See, e.g., Security Pacific Nat'l. Bank v. Derderian,* 872 F.2d 281, 286–87 (9th Cir.1989) (direct effect requirement incorporates minimum contacts standard for personal jurisdiction set forth in *International Shoe v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and progeny). The dealings between the BCRP and Novotec created no "minimum contacts" with the United States. Novotec's cause of action arose entirely within Peru. The fact that United States computer companies might have been affected by Novotec's breaches is jurisdictionally irrelevant.

### C. Comity

Finally, Corzo argues that despite the Peruvian Supreme Court's orders declaring the original judgment null and void, he nonetheless has a valid judgment against the BCRP which the spirit of international comity requires us to recognize and enforce. We disagree.

In fact, Corzo appears not to have a final and valid Peruvian judgment that United States courts may feel comfortable enforcing. Corzo's experts may be right that the Peruvian Supreme Court's orders were unprecedented and extra-legal. That, however, is not for us to decide. Even if we were to conclude that the Peruvian Supreme Court's orders nullifying its previous judgment were illegal, comity would prevent us from enforcing the original judgment. Nothing would be more repugnant to the principle of comity than for United States courts to allow a defendant's assets to be attached to enforce a Peruvian judgment when the highest court of Peru has declared that judgment null and void.

### CONCLUSION

For the foregoing reasons, the judgment is AFFIRMED.

SILVERMAN, Circuit Judge, concurring:

In this case, foreign sovereign immunity has been invoked, not to protect a foreign instrumentality from *United States* courts, but from its *own* courts. This lawsuit was brought to enforce a judgment already rendered against the Peruvian Central Bank, in Peru, by the courts of Peru. The application of foreign sovereign immunity in these circumstances is at cross purposes with international comity and respect for sovereign nations, the very principles underlying foreign sovereign immunity in the first place. *Verlinden v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983).

We need not decide today how to resolve any tension between those principles and the language of the Foreign Sovereign Immunity Act in cases involving nothing more than the domestication of an existing foreign judgment. As my colleagues in the majority point out, the Peruvian judgment that the plaintiffs seek to enforce was declared null and void by the Peruvian Supreme Court in 1998. It is for *that* reason that I would affirm the district court's dismissal of the complaint to domesticate the judgment.