RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0058p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

TROY ROTE; AMANDA ROTE,

*Plaintiffs-Appellees,*

*v.*

ZEL CUSTOM MANUFACTURING LLC, et al.,

*Defendants,*

DIRECCIÓN GENERAL DE FABRICACIONES MILITARES,

*Defendant-Appellant.*

No. 15-3156

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:13-cv-01189—James L. Graham, District Judge.

Argued: October 8, 2015

Decided and Filed: March 7, 2016

Before: KEITH, CLAY, and WHITE, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Lawrence D. Walker, TAFT STETTINIUS & HOLLISTER LLP, Columbus, Ohio, for Appellant. Daniel N. Abraham, COLLEY SHROYER & ABRAHAM CO., LPA, Columbus, Ohio, for Appellees. **ON BRIEF:** Lawrence D. Walker, TAFT STETTINIUS & HOLLISTER LLP, Columbus, Ohio, for Appellant. Daniel N. Abraham, COLLEY SHROYER & ABRAHAM CO., LPA, Columbus, Ohio, for Appellees.

KEITH, J., delivered the opinion of the court in which CLAY and WHITE, JJ., joined. WHITE, J. (pp. 18–19), delivered a separate concurring opinion.

1

---

**OPINION**

---

DAMON J. KEITH, Circuit Judge.   Plaintiff Troy Rote injured his right hand when a round exploded as he loaded a rifle at a residence in Sunbury, Ohio.  The round that exploded was allegedly manufactured by Defendant Fabrica Militar Fray Luis Beltran a/k/a Dirección General Fabricaciones Militares ("DGFM").  Rote and his wife (collectively, "Plaintiffs") filed this negligence and products-liability suit against several defendants, including DGFM.

DGFM moved to dismiss the Third Amended Complaint (or, "Complaint") for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  In support of its motion, DGFM argued that, as an instrumentality of the Republic of Argentina, it is immune from suit under the Foreign Sovereign Immunities Act ("FSIA" or "Act"), 28 U.S.C. § 1602 *et seq*.  In response, Plaintiffs argue that the "commercial activity" exception to the Act applies, and hence, DGFM is not immune.  The district court denied the 12(b)(1) motion and DGFM appeals.  For the reasons set forth below, we AFFIRM the district court's decision denying the motion.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  Plaintiffs' Allegations in the Complaint.

For purposes of reviewing DGFM's Rule 12(b)(1) motion, we take note of the following relevant allegations in the Complaint:

Troy Rote was invited to Gary and Judith Buyer's house, located in Sunbury, Ohio. (Third Am. Compl. ¶¶ 21–22.)  On or about September 10, 2011, Rote, along with twelve to fifteen other guests, arrived at the Buyers' home.  (*Id.* ¶ 21.)  One of those guests, Edward Grimm, brought a rifle, consisting of a ".50 caliber upper and AR-15 lower receiver," as well as some ammunition.  (*Id.* ¶ 23.)  Grimm assembled the 0.50 caliber upper receiver and the lower receiver at the residence.  (*Id.* ¶ 24.)

At Grimm's invitation, five or six guests fired the rifle. (*Id.* ¶ 25.) Grimm also invited and encouraged Rote to fire the rifle and provided loading and firing instructions. (*Id.* ¶ 27.) As Rote loaded the rifle, and before the bolt moved into a closed-and-secured position, the round exploded and a "loud sound" was heard. (*Id.* ¶¶ 28, 29.) Rote "sustained severe damage to his right hand." (*Id.* ¶¶ 28, 34.) The round that exploded came from a "box of ammunition bearing marks identifying it as being manufactured by [DGFM]." (*Id.* ¶ 34.) The allegedly defective ammunition was purchased online through a New Jersey-based company, Ammoman. (*Id.* ¶¶ 8, 33.) The Complaint does not indicate from whom Ammoman purchased the ammunition.

Plaintiffs allege that DGFM "designed, manufactured, and sold and/or otherwise introduced into the stream of commerce" the ammunition. (*Id.* ¶ 62.) Plaintiffs also allege that DGFM's wrongful acts consisted of defectively designing and manufacturing the rounds to have a "protruding primer." (*See id.* ¶ 106.) Plaintiffs further allege that DGFM failed to provide adequate warnings about the dangerous condition posed by this protruding primer. (*Id.* ¶¶ 90–93.)

Plaintiffs assert the following claims against DGFM: (1) product liability under Ohio Rev. Code Ann. §§ 2307.74, 2307.75, and 2307.77; (2) supplier liability under Ohio Rev. Code Ann. § 2307.78; and (3) loss of consortium.

## B. District court decision.

DGFM moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), arguing that, as an instrumentality of the Republic of Argentina, it is immune from suit under the Act. The district court denied the motion. *Rote v. Zel Custom Mfg.*, No. 2:13-cv-1189, 2015 WL 570973, at *10 (S.D. Ohio Feb. 11, 2015). In support of its ruling, the court held that the design and manufacture of the ammunition qualified as "commercial activity." *Id.* at *6–7. The court also noted that DGFM's actions caused a "direct effect" in the United States. *Id.* at *10. Thus, the commercial-activity exception to the FSIA applied and DGFM was not immune from suit. *Id.* at *1. DGFM timely appealed.

## II.  STANDARD OF REVIEW

An order denying a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) is reviewed de novo.  *Westfield v. Fed. Republic of Germany*, 633 F.3d 409, 413 (6th Cir. 2011).  Rule 12(b)(1) motions "come in two varieties: a facial attack or a factual attack."  *O'Bryan v. Holy See*, 556 F.3d 361, 375 (6th Cir. 2009) (citation and quotation marks omitted).  A facial attack—like the one DGFM mounts here—"questions merely the sufficiency of the pleading."  *Id.* (citation and quotation marks omitted).  In reviewing the facial attack, courts must accept all allegations as true, *id.*, and when reviewing the complaint, we look for a "short and plain statement of the grounds for the court's jurisdiction."  Fed. R. Civ. P. 8(a); *see also Owens v. Republic of Sudan*, 531 F.3d 884, 894–95 (D.C. Cir. 2008).  "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."  *O'Bryan*, 556 F.3d at 376 (citation omitted).  If the allegations in the Complaint establish federal claims, the exercise of subject-matter jurisdiction is proper.  *Id.*

## III.  ANALYSIS

### A.  Statutory framework: FSIA and its exceptions.

The FSIA provides the "sole basis" for the exercise of jurisdiction over a foreign state, including its instrumentalities.[1]  *Republic of Argentina v. Weltover*, 504 U.S. 607, 611 (1992) (citation omitted); *see also* 28 U.S.C. §§ 1603(a)–(b), 1604.  Under the Act, a foreign state is "immune from the jurisdiction of the courts of the United States and of the States" unless one of the statutory exceptions applies.  28 U.S.C. § 1604.  At issue in this case is the commercial-activity exception, codified at 28 U.S.C. § 1605(a)(2).

Plaintiffs contend that the following clause of the exception, which is split into three elements, applies in this case:

---

[1]Plaintiffs allege that DGFM is an instrumentality of the Republic of Argentina. (Third Am. Compl. ¶ 16.) For purposes of this opinion, we take that to be true.  *O'Bryan*, 556 F.3d at 376 (explaining that courts accept allegations in the complaint as true when reviewing a facial attack on the subject-matter jurisdiction alleged in the complaint).

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case –
>
> . . . in which the action is based . . . **[i]** upon an act outside the territory of the United States **[ii]** in connection with a commercial activity of the foreign state elsewhere and **[iii]** that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  (*See* Appellee Br. 11.).  The statute defines "commercial activity" as follows:

> A 'commercial activity' means either a regular course of commercial conduct or a particular transaction or act.  The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d).

### B.  This appeal.

This court has jurisdiction over this appeal because an order denying a motion to dismiss under 28 U.S.C. § 1604 is immediately appealable under 28 U.S.C. § 1291.  *O'Bryan*, 556 F.3d at 372.

Three issues are relevant on appeal: (1) whether the design and manufacture of a product constitutes a "commercial activity" under the FSIA; (2) whether a court must find that a foreign state has minimum contacts with the United States in order to conclude that the state's acts have a direct effect here; and (3) whether the Complaint lacks a short and plain statement of jurisdiction in violation of Federal Rule of Civil Procedure 8(a)(1).[2]  (Appellant Br. 3.).  We address each argument below.[3]

---

[2]Despite Plaintiffs' assertions to the contrary, this third issue is not waived.  The essential premise of DGFM's 12(b)(1) motion is that the Complaint as a whole fails to comply with Rule 8(a)(1).  *See Doe v. Holy See*, 557 F.3d 1066, 1073–74 (9th Cir. 2009).

[3]As a preliminary matter, we must be assured that the commercial activity occurred outside the United States.  *See* 28 U.S.C. § 1605(a)(2).  The Complaint does not allege that the design and manufacture took place outside the United States.  As the district court noted, however, the Complaint "supports a plausible inference that [it] occurred in Argentina." *Rote*, 2015 WL 570973, at *5.  We agree, and DGFM does not take issue with this particular conclusion on appeal. *See Rux v. Republic of Sudan*, 461 F.3d 461, 468 (4th Cir. 2006) (noting that a challenge to subject-matter jurisdiction under the FSIA "is similar to that of Rule 12(b)(6), under which dismissal is

### 1. The design and manufacture of the ammunition qualifies as a "commercial activity."

When we ascertain the applicability of the commercial-activity exception, two "distinct" limitations apply. *O'Bryan*, 556 F.3d at 379. "First, the activity must be of the type in which private individuals engage . . . ." *Id.* "[I]f the activities in question are not private, but sovereign in nature, then the commercial activity exception will not apply." *Id*; *see also Weltover*, 504 U.S. at 614 ("[W]hen a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA. . . ."). Second, courts must "ascertain the claim's gravamen to determine whether the FSIA plaintiff is simply using creative nomenclature as a semantic ploy to shroud the true essence of its theory and obtain jurisdiction over a claim that Congress did not intend to be brought against a foreign sovereign." *O'Bryan*, 556 F.3d at 380 (citation and quotation marks omitted). In other words, courts must "avoid the artful pleading of plaintiffs and look to the core of the activities alleged to be commercial in nature." *Id.*

Under *O'Bryan*'s first limitation, we conclude that the design and manufacture of a product is the type of activity "in which private individuals engage." *O'Bryan*, 556 F.3d at 379. Our sibling circuits have reached the same conclusion. *See Aldy on Behalf of Aldy v. Valmet Paper Mach.*, 74 F.3d 72, 76 (5th Cir. 1996); *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1544 (11th Cir. 1993). For example, in *Aldy*, the Finland-based defendant manufacturer moved for summary judgment, arguing in part that it was immune under the FSIA. 74 F.3d at 74. The trial court denied the motion, and the Fifth Circuit affirmed the denial. *Id.* at 74–76. In that case, the plaintiff alleged that the manufacturer was in the "business of designing and manufacturing paper machines in Finland." *Id.* at 75. As part of their wrongful-death lawsuit, the plaintiffs claimed that the defendant's negligent design of those machines caused the death of two individuals. *Id.* at 73–74. The Fifth Circuit concluded that "the plaintiffs' suits appear to be classic design and manufacturing defect suits, which the third clause of the commercial activities exception is broad enough to cover." *Id.* at 75; *see also Vermeulen*, 985 F.2d at 1544 (holding that the defendant's design and manufacture of vehicles "unquestionably were acts connected to

---

warranted if *no* plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief.") (citation omitted) (emphasis added).

a commercial activity"); *see generally Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1082 (9th Cir. 2001) (noting the parties' agreement that the design, manufacture, and sale of an aircraft were "in connection with a commercial activity"); *Peré v. Nuovo Pignone, Inc.*, 150 F.3d 477, 481 (5th Cir. 1998) (stating that the "[t]he district court correctly found that the commercial activity upon which the plaintiff's cause of action was based was the design and manufacture of turbine systems."). We agree with the sound reasoning of our sibling circuits and find no reason to depart from their conclusions here.

Second, a review of the Complaint does not reveal a "semantic ploy" by Plaintiffs to recast a governmental activity to be "commercial" in nature. *O'Bryan*, 556 F.3d at 380. Indeed, the type of the activity at issue here is far from analogous to the type of activity that courts have described as "sovereign" in nature. *See, e.g.*, *Weltover*, 504 U.S. at 614 ("[A] foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party."); *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 361–63 (1993) (holding that the abuse of police power was sovereign in nature and so the Saudi Arabian government was immune); *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1326–27 (11th Cir. 2003) (holding that the Pakistani government's expropriation of property and failure to pay for that expropriation involved the sovereign power of eminent domain and was thus not commercial in nature); *Park v. Shin*, 313 F.3d 1138, 1145 (9th Cir. 2002) ("[A]n activity is commercial unless it is one that only a sovereign state could perform."). Therefore, the Complaint easily passes muster under *O'Bryan*'s second limitation.

DGFM offers a different reading of the exception altogether. Although it does not clearly explain its position, we understand it to be as follows: the third clause of the commercial-activity exception comprises three elements. *See* Section III.A, *supra*. The first element—the wrongful act outside the United States—is the negligent design and manufacture of the ammunition, which DGFM arguably concedes is met here. (Reply Br. 5.) But DGFM argues that the second element—the wrongful act's connection with a commercial activity—is not met here. (*Id.*) DGFM contends that Plaintiffs cannot rely on the design and manufacture of ammunition to satisfy both elements, which are "separate and distinct," and argues that

commercial activity must consist of either the marketing, sale, or distribution of the ammunition rather than mere design or manufacture.  (*Id.*; Appellant Br. 11.)   In support of these propositions, DGFM cites, among other cases, *Vermeulen*, which expressed that "[t]he sale of merchandise is a quintessential commercial activity."  985 F.2d at 1544.

DGFM's reading of the statute and case law is strained.  Granted, in *Lyon* and *Vermeulen*, the Ninth and Eleventh Circuits, respectively, referred to the defendants' sale of defective products when determining if the exception applied.  *Vermeulen*, 985 F.2d at 1544; *Lyon*, 252 F.3d at 1082.  In *Vermeulen*, for instance, the court noted that the defendant designed and built the automobiles for sale "throughout the world," and that these sales constituted "quintessential commercial activity."  *Vermeulen*, 985 F.2d at 1544.  While we agree that the sale of goods qualifies as "quintessential commercial activity," it does not follow that the sale of goods is a necessary predicate to a finding that an activity is "commercial" in nature.  In *Aldy*, the Fifth Circuit did not rely on the defendant's sale of the paper machines to conclude that the defendant engaged in commercial activity; the court merely relied on the design and manufacture of the paper machines to reach that conclusion.  *Aldy*, 74 F.3d at 75.  So, we do not—and cannot—read those cases to conclude that a defective product *must* be marketed, sold, or otherwise distributed for the commercial-activity exception to apply.  To be sure, and as discussed further below, we have previously cautioned courts not to read "unexpressed requirements" into the FSIA.  *See Keller v. Cent. Bank of Nigeria*, 277 F.3d 811, 818 (6th Cir. 2002), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010).[4]

At oral argument, DGFM's counsel noted that one of the unintended consequences of war is that ammunition and machinery, which may have been manufactured exclusively for military purposes, end up in the hands of the public.  This court, so the argument goes, risks subjecting DGFM to the jurisdiction of the United States courts when it possibly never intended for the

---

[4]The two elements that DGFM misconstrues merely "ensure" that there "must be a connection between the plaintiff's cause of action and the commercial acts of the foreign sovereign."  *Aldy*, 74 F.3d at 75 (citation omitted) (emphasis omitted).   Here, DGFM's alleged wrongful acts—i.e., the defective design and manufacture of ammunition and failure to warn of its hazards—are commercial in nature and form the basis of Plaintiffs' claims of supplier and product liability, as well as loss of consortium.

ammunition to get into the hands of civilians like Rote. Stated another way, DGFM asserts that there is a fundamental difference between the ammunition at issue here and the paper machines at issue in *Aldy* or the cars at issue in *Vermeulen*: the defective products in those cases were clearly intended for some non-governmental end-user, whereas the same cannot be said for the ammunition. *Cf. Aldy*, 74 F.3d at 75; *Vermeulen*, 985 F.2d at 1544.

We are not persuaded by this argument. Both the Supreme Court and this court have followed Congress' mandate to look to the "nature" of the act, and not the "purpose" behind it. *Weltover*, 504 U.S. at 614; *O'Bryan*, 556 F.3d at 378–79; *accord* 28 U.S.C. § 1603(d). Accordingly, whether the ammunition was used or intended for military purposes is of no consequence. *See, e.g.*, *Weltover*, 504 U.S. at 614–15 ("[A] contract to buy army boots or even bullets is a 'commercial' activity[] because private companies can similarly use sales contracts to buy goods"); *McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 349 (8th Cir. 1985) ("[A] contract by a foreign government to buy equipment for its armed services constitutes a commercial activity to which sovereign immunity does not apply."). What matters is that DGFM acted like a private market participant when it designed and manufactured the allegedly defective product; and DGFM does not assert that only governmental actors manufacture and design ammunition. If we give any weight to the fact that the ammunition was manufactured for military purposes, we would in effect flout Congress and the Supreme Court's express instruction that courts must look to the nature of the wrongful activity rather than its purpose.

Accordingly, we conclude that DGFM's alleged negligent design and manufacture of the defective ammunition qualifies as a "commercial activity" for purposes of the FSIA. This conclusion, however, does not end our inquiry. For the commercial-activity exception to apply, the activity must also have a "direct effect" in the United States. *See* 28 U.S.C. § 1605(a)(2).

### 2. Plaintiffs have adequately alleged that DGFM's acts had a "direct effect" in the United States.

DGFM argues that that a foreign state's wrongful act will have a direct effect only if the foreign state's contacts with the United States are "substantial," (Appellant Br. 16.) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 490 (1983)), or if the foreign state has "contacts, ties, and relations" with the United States, (Appellant Br. 18) (quoting *World-Wide*

*Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299 (1980)). DGFM argues that for subject-matter jurisdiction to exist under the FSIA, a court must conduct a "minimum contacts" inquiry under *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). In other words, DGFM asserts that subject-matter jurisdiction is only proper if personal jurisdiction over the foreign state complies with the Due Process Clause of the Fifth Amendment. (Appellant Br. 17.) In support of this reading, DGFM relies on the legislative history of the FSIA, which states that the "requirements of minimum jurisdictional contacts and adequate notice are embodied in . . . [28 U.S.C. § 1330(b), FSIA's long-arm statute]." H.R. Rep. No. 94-1487 (1976), at 13, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6612. According to the House Report, several jurisdictional prerequisites embodied elsewhere in the law are "carefully interconnected" with the FSIA's provisions. *Id.* at 13–14; (*See* Appellant Br. 17.).

a. *Waiver.*

As an initial matter, we must determine if this argument is waived because DGFM did not raise it before the district court. *See Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 614–15 (6th Cir. 2014) (discussing general rule that arguments not raised at the district court level are not considered on appeal). Because DGFM's motion contested the district court's exercise of subject-matter jurisdiction in general, we conclude that failure to raise the argument below does not compel a finding of waiver. *See Clinton v. City of New York*, 524 U.S. 417, 428 (1998) ("Because the argument poses a jurisdictional question (although not one of constitutional magnitude), it is not waived by the failure to raise it in the District Court."); *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 408 n.8 (6th Cir. 2012) (holding that a standing argument not raised at the district court level could not be waived because it related to a "jurisdictional requirement"). More critically, "we have an independent duty to inquire *sua sponte* whenever a doubt arises as to the existence of federal question jurisdiction." *Ky. Press Ass'n, Inc. v. Kentucky*, 454 F.3d 505, 508 (6th Cir. 2006) (internal quotation marks and citation omitted). In keeping with that duty, we now address DGFM's argument.

*b. Incorporation of "minimum contacts" test.*

To determine whether the "direct effect" element incorporates the "minimum contacts" test, we start with the plain language of the statute. *See Brilliance Audio, Inc. v. Haights Cross Comm'ns, Inc.*, 474 F.3d 365, 371 (6th Cir. 2007) ("As with any question of statutory interpretation, we must first look to the language of the statute itself."); *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 549 (6th Cir. 1999) ("When interpreting a statute, we must begin with its plain language . . . ."). "If the language of the statute is clear, then the inquiry is complete, and the court should look no further." *Brilliance*, 474 F.3d at 371 (citations omitted). "Only if the statute is inescapably ambiguous should a court look to other persuasive authority"—such as legislative history—"in an attempt to discern legislative meaning." *Id.* (citation and internal quotation marks omitted); *see also In re Danny's Markets, Inc.*, 266 F.3d 523, 525 (6th Cir. 2001) ("When . . . a statutory term is ambiguous, it is our duty to examine the legislative history in order to render an interpretation that gives effect to Congress's intent.") (citation and internal quotation marks omitted).

Here, the phrase "an act [that] causes a direct effect in the United States" is not ambiguous. *See* 28 U.S.C. § 1605(a)(2). The operative words are "direct effect." Although the statute does not define these terms, we must give them their ordinary meaning if possible. *See Weltover*, 504 U.S. at 618 ("[A]n effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity.'") (citation omitted). Because we can give these words their ordinary meaning without any resulting ambiguity, resort to legislative history is not necessary. S*ee Lockhart v. Napolitano*, 573 F.3d 251, 258, 262 (6th Cir. 2009) (reasoning that resort to legislative history was unnecessary where the undefined term could be given its "ordinary, contemporary, common meaning"); *Limited, Inc. v. C.I.R.*, 286 F.3d 324, 335 (6th Cir. 2002) (concluding that tax court erred in examining legislative history of the statute where statutory term should have been given its ordinary and natural meaning); *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1325–26 (7th Cir. 1997) ("Although appellants would have us delve into legislative history to cast a different light on the [undefined] term 'transaction,' we must give meaning to the plain language actually used by Congress."). Even if we do look at legislative history, DGFM's argument is still unpersuasive where the legislative

history is being used to inject into the statute additional "unexpressed requirement[s]," *Weltover*, 504 U.S. at 618, rather than resolve any inherent ambiguity.  Indeed, this case is markedly different from other cases where courts have concluded that resort to legislative history was proper because a term or phrase had multiple meanings.  *See, e.g.*, *Brilliance*, 474 F.3d at 372 (concluding that phrase was ambiguous because the parties identified two "plausible readings"); *In re Vause*, 886 F.2d 794, 796 (6th Cir. 1989) (explaining that disputed term had "two possible meanings" and was thus "inherently ambiguous"); *United States v. Graham Mortg. Corp.*, 740 F.2d 414, 417 (6th Cir. 1984) ("Where the language of the statute is ambiguous and can be interpreted to support readings either imposing or not imposing criminal liability . . . the court must turn to the legislative history of the statute.") (citations omitted).

Our approach today is consistent with the Supreme Court's approach in *Weltover*.  There, the question was whether the "direct effect" element was met.  *Weltover*, 504 U.S. at 617.  The defendant in that case argued that the effect must be both "substantial" and "foreseeable" in order for a court to conclude that it is "direct."[5]  *Id.*  In support, the defendant relied on FSIA's legislative history—specifically, the House Report.  *Id.* at 617–18.  According to the House Report, "conduct covered by the third clause of § 1605(a)(2) would be subject to the jurisdiction of American courts 'consistent with principles set forth in section 18, Restatement of the Law, Second, Foreign Relations Law of the United States (1965).'"  *Id.*  That section states that "American laws are not given extraterritorial application except with respect to conduct that has, as a 'direct and foreseeable result,' a 'substantial' effect within the United States."  *Id.* at 618.  The Supreme Court, however, found that legislative history inapposite and rejected the idea that the Act intended an "unexpressed requirement of 'substantiality' or 'foreseeability.'"  *Id.*; *see also Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 857 (7th Cir. 2012) (en banc) ("*Weltover* reached its definition of 'direct' for FSIA purposes only after refusing to import from the legislative history of that statute the notion that an effect is 'direct' only if it is both 'substantial' and 'foreseeable.'") (citation omitted); *Olden v. LaFarge Corp.*, 383 F.3d 495, 501–

---

[5]In addition to this issue, *Weltover* faced the question at issue here—whether the "direct effect" element incorporates the "minimum contacts" test.  504 U.S. at 619–20.  The Supreme Court, however, did not resolve the question.  *Id; see Vermeulen*, 985 F.2d at 1545 ("[T]he [*Weltover*] Court did not resolve whether section 1605(a)(2) incorporates the minimum contacts test.")

02 (6th Cir. 2004) (concluding that a statute overruled a particular Supreme Court holding notwithstanding the legislative history to the contrary).

We followed *Weltover*'s approach in *Keller* when we interpreted the "direct effect" element. *Keller*, 277 F.3d at 817–18. In that case, the question was whether an act must be "legally significant" in order for a court to conclude that it has a "direct effect" here. *Id.* at 817. In concluding that the answer was no, we interpreted *Weltover* as an "admonishment to courts not to add any unexpressed requirements to the language of the statute."[6] *Id*. at 818 (citation omitted). Taken together, *Weltover* and *Keller* counsel us that we may not read anything *into* the statute, but must, quite simply, read it.[7]

This approach makes even more sense if we consider how courts have interpreted the "direct effect" element. Indeed, the scope of this element has been the subject of much litigation. For example, must an act be "legally significant" in order for it to have a "direct effect" (*Keller*)? No. Must the effect be "substantial" and "foreseeable" in order to be considered "direct" (*Weltover*)? No. Had this court or the Supreme Court answered these questions in the affirmative, we would have given courts free rein to read into the statute requirement upon requirement to no end in sight, widening the gulf between the statute as enacted and the statute as

---

[6]Because of *Weltover*'s admonishments, we are not persuaded by a concurring opinion from this Circuit that reads the "minimum contacts" requirement into the statute. *See Triple A Int'l., Inc. v. Democratic Republic of Congo*, 721 F.3d 415, 418 (6th Cir. 2013) (Merritt, J., concurring). The concurring opinion in *Triple A*, relying on the FSIA's legislative history, stated that "[w]hether the Constitution—as distinguished from the Act—requires such [minimum] 'contacts' is not the point. The Act itself explicitly requires such contacts." Concurring opinions, however, do not constitute binding authority, and we do not follow this particular one here. *Fed. Exp. Corp. v. Tenn. Pub. Serv. Comm'n*, 925 F.2d 962, 966 n.2 (6th Cir. 1991).

[7]Of course, we do not mean to imply that the decision to rely on legislative history is never appropriate. After all, the Supreme Court itself took a different approach in *Samantar* from the approach it took in *Weltover*. There, the majority relied on legislative history in interpreting the FSIA statute; three Justices wrote separate concurrences, disapproving of the majority's reliance. *Samantar*, 560 U.S. at 326–29. The issue was whether the FSIA "covers the immunity claims of foreign officials." *Id.* at 313. The majority turned to the plain meaning of the statute, 28 U.S.C. § 1603 (containing definitions of certain terms and phrases), to determine whether an official would be immune. *Id.* at 314. The *Samantar* majority then relied on legislative history to *support* its reading of the plain meaning of the statute. *Id.* at 323. *Samantar*'s approach is not as applicable in this case where DGFM suggests that we read additional unexpressed requirements into the statute rather than rely on its plain meaning. For that reason, *Weltover*'s approach is more applicable. *See Olden*, 383 F.3d at 505–06 ("[T]he primary rule of statutory interpretation . . . is that a court will not look beyond the statutory text if the text is unambiguous. Of course, if the statutory text and legislative history are consistent, the primary rule is unnecessary because the result will be the same regardless of whether a court follows the rule or not.") (internal citation omitted).

interpreted. In holding that the "direct effect" requirement does not incorporate the "minimum contacts" test, this court avoids this danger altogether.

At best, what DGFM advances here is a *personal*-jurisdiction argument disguised as one sounding in subject-matter jurisdiction. To the extent that DGFM asserts a personal jurisdiction defense, that defense is not properly before this court because DGFM never moved for dismissal for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) in the district court. *Hayward*, 759 F.3d at 614–15. Further, allowing foreign instrumentalities to make their arguments about minimum contacts that are relevant to a 12(b)(2) defense through the backdoor of a Rule 12(b)(1) motion would essentially relieve them from compliance with the Federal Rules of Civil Procedure.

In reaching our conclusion that the "direct effect" element does not incorporate the "minimum contacts" test, we acknowledge that the Ninth Circuit has adopted DGFM's reading. *Corzo v. Banco Cent. de Reserva del Peru*, 243 F.3d 519, 525–26 (9th Cir. 2001) (engaging in "minimum contacts" analysis to conclude that activity had no "direct effect") (citing *Sec. Pac. Nat'l Bank v. Derderian*, 872 F.2d 281, 286–287 (9th Cir. 1989)).[8] Even so, we do not find the

---

[8]Other circuits have suggested that the "direct effect" analysis and "minimum contacts" test are related, but the Ninth Circuit appears to stand alone in expressly incorporating the "minimum contacts" test wholesale. The Eleventh Circuit, for example, has noted the overlap without holding that minimum contacts are required to exercise subject-matter jurisdiction. *Guevara v. Republic of Peru*, 608 F.3d 1297, 1309–10 (11th Cir. 2010) (analyzing the "direct effect" element and analogizing to, but not incorporating, the "minimum contacts" test); *S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1304 (11th Cir. 2000) ("The 'direct effects' language of § 1605(a)(2) closely resembles the 'minimum contacts' language of constitutional due process, and these two analyses have overlapped."). Similarly, the Second Circuit has held that the questions of subject-matter jurisdiction and personal jurisdiction may be so "inextricably intertwined" that appellate courts should exercise pendent jurisdiction over a personal-jurisdiction claim on interlocutory appeal of a decision denying a motion to dismiss for lack of subject-matter jurisdiction. *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs., Co.*, 199 F.3d 94, 97 (2d Cir. 1999) (per curiam); *see also Abi Jaoudi & Azar Trading Corp. v. Cigna Worldwide Ins. Co.*, 391 F. App'x 173, 181 (3d Cir. 2010) (acknowledging that the district court's ruling on personal jurisdiction may be "inextricably intertwined" with the district court's ruling on sovereign immunity). And although the Second Circuit once held that the "direct effect" requirement was not met because a defendant did not satisfy the "minimum contacts" test in a pre-*Weltover* case, *see Carey v. Nat'l Oil Corp.*, 592 F.2d 673, 676 (2d Cir. 1979) (per curiam), the court has more recently acknowledged that subject-matter jurisdiction may lie even when personal jurisdiction does not, *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 760 n.8 (2d Cir. 1998) (noting it is "possible that a foreign sovereign could be subject to subject matter jurisdiction under the commercial activities exception without being within the personal jurisdiction of an American court"). Tellingly, recent Second Circuit cases have analyzed the FSIA's "direct effect" element without reference to minimum contacts. *See, e.g., Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131, 138–40 (2d Cir. 2012); *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 79–81 (2d Cir. 2010); *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 157–59 (2d Cir. 2007); *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 236–41 (2d Cir. 2002). Thus, although there is overlap between questions of subject-matter jurisdiction and personal

Ninth Circuit's approach persuasive. In reading the "direct effect" element, the Ninth Circuit went beyond the plain meaning of the FSIA's terms and relied on the same legislative history we reject to read into the statute requirements that are simply not there. *See, e.g.*, *Derderian*, 872 F.2d at 285–86 n.11. Further, *Derderian* pre-dates *Weltover*, and so the court did not have the benefit of *Weltover*'s admonishment that we must not read "unexpressed requirements" into the statute. *Keller*, 277 F.3d at 817. That *Derderian* is still cited by courts after *Weltover*, *see, e.g.*, *Corzo*, 243 F.3d at 525–26, makes little difference. In the end, the Ninth Circuit's approach, in this post-*Weltover* period, is not persuasive.

### c. Direct effect in product-liability cases.

Having concluded that the "direct effect" element does not incorporate the "minimum contacts" test, we must now determine whether Plaintiffs have adequately alleged that DGFM's actions have a direct effect here in the United States. The Supreme Court has held that "an effect is 'direct' if it follows as an immediate consequence of the defendant's . . . activity." *Weltover*, 504 U.S. at 618 (citation omitted). "The common sense interpretation of a direct effect . . . is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." *Guirlando*, 602 F.3d at 74–75 (quotation marks and citation omitted).

In some contexts, "[c]ourts have struggled to announce objective standards and clear rules for determining what does and does not qualify as a direct effect in the United States." *Westfield*, 633 F.3d at 414. Yet, in the context of product-liability cases, courts have routinely held that an injury caused by an allegedly defective product meets the "direct effect" element. *Vermeulen*, 985 F.2d at 1545; *Lyon*, 252 F.3d at 1083; *Aldy*, 74 F.3d at 75. In *Vermeulen*, for example, the plaintiff suffered injuries in a car accident as a result of the defective design and manufacture of the car. *Vermeulen*, 985 F.2d at 1537. The court expressed that it could "hardly imagine a more immediate consequence of the defendant's activity." *Id.* at 1545.[9] In *Lyon*, the survivors of persons killed in a plane crash sued the foreign defendants that designed and

---

jurisdiction, most circuits appear to treat the inquiries as distinct. *Cf. I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1188–91 (D.C. Cir. 2003) (addressing questions separately).

[9]*Vermeulen*, while determining whether federal jurisdiction exists, performed the "minimum contacts" test. 985 F.2d at 1545–52. However, it acknowledged that *Weltover* never resolved the question of whether the "direct effect" element incorporated the test, *see id.* at 1545, and therefore, it was not bound by *Weltover* to do so.

manufactured the aircraft. *Lyon*, 252 F.3d at 1081. The foreign defendants were instrumentalities of the Republic of Italy. *Id.* In determining whether the "direct effect" element was met, the *Lyon* court, relying on *Vermeulen*, answered in the affirmative. *Id.* at 1083. *Lyon* also acknowledged the possibility of a defective product "chang[ing] hands," and concluded that while "speculation about the ravages of others along the way . . . may affect proof, they do not affect jurisdiction." *Id.* at 1084. Finally, like the courts in *Vermeulen* and *Lyon*, the *Aldy* court concluded that the death of the plaintiffs satisfied the "direct effect" element. *Aldy*, 74 F.3d at 75.

Applying the reasoning of *Vermeulen* and *Lyon* here, this court notes that Rote alleges that he was injured as a result of the defective ammunition manufactured by DGFM. (*See, e.g.*, Third Am. Compl. ¶ 34 (alleging that the round that exploded came from a box of ammunition identifying manufacturer as DGFM); ¶¶ 90–92 (describing defects affecting the ammunition and DGFM's wrongful acts); ¶¶ 35–37 (describing physical, emotional, and economic injuries sustained by Rote)). Thus, we hold that the "direct effect" requirement was met here, and the exercise of subject-matter jurisdiction is proper under the FSIA's commercial-activity exception.

### 3. DGFM fails to demonstrate that the Complaint otherwise lacks a plain and short statement of jurisdiction.

DGFM advances other arguments in support of its Rule 12(b)(1) motion. As shown below, none of these is availing.

First of all, DGFM contends that Plaintiffs were required to "mention" which exception to the FSIA applied, and that failure to do so was "fatal." (Appellant Br. at 8, 10.) That is not the case. *AmSouth Bank v. Dale*, 386 F.3d 763, 779 (6th Cir. 2004) ("Affirmative pleading of the precise statutory basis for federal subject matter jurisdiction is not required as long as a complaint alleges sufficient facts to establish jurisdiction.") (quoting *In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 5 (1st Cir. 1999)); *see also Universal Trading & Inv. Co., Inc. v. Bureau for Representing Ukrainian Interests in Int'l & Foreign Courts*, 898 F. Supp. 2d 301, 309 n.3 (D. Mass. 2012), *aff'd*, 727 F.3d 10 (1st Cir. 2013) (rejecting defendant's contention that "any applicable exception [to the FSIA] must be alleged in the complaint").

Therefore, Plaintiffs' omission of the statutory provision identifying the commercial activity exception, 28 U.S.C. § 1605(a)(2), does not divest this court of jurisdiction.

Next, DGFM implies that our jurisdictional review of Plaintiffs' allegations related to the commercial-activity exception is confined to the section of the Complaint entitled "Jurisdiction and Venue," which fails to demonstrate that the exercise of jurisdiction is proper.[10] (Appellant Br. 10.) That argument is overly technical and not correct. In determining whether there is a proper basis for the exercise of jurisdiction, we read the complaint "holistically." *In re Mailman*, 196 F.3d at 5; *see also J&J Sports Prods., Inc. v. Rose's Dream, Inc.*, 818 F. Supp. 2d 1, 3 (D.D.C. 2010) (explaining that defendant's argument that the complaint should be amended to include proper jurisdictional allegations was "overly technical" where the basis for jurisdiction was "clear from the face of the complaint.") (citations omitted); *Harary v. Blumenthal*, 555 F.2d 1113, 1115 n.1 (2d Cir. 1977) ("When the complaint pleads facts from which federal jurisdiction may be inferred . . . the insufficiency of the jurisdictional allegation is not controlling, and the action need not be dismissed.") (citations omitted). As shown in Sections III.B.1 and B.2, a review of the entire Complaint demonstrates that subject-matter jurisdiction exists here; so, the Complaint complies with Rule 8(a)'s basic requirements.

## IV.   CONCLUSION

For the reasons set forth above, this court **AFFIRMS** the decision of the district court.

---

[10]Counsel for DGFM seemingly retreated from this particular position at oral argument. We nonetheless address it here.

---

**CONCURRENCE**

---

HELENE N. WHITE, Circuit Judge, concurring.   I join in the affirmance but write separately to address the House Report relied on by DGFM and the Ninth Circuit in concluding that the subject-matter inquiry subsumes the personal-jurisdiction/minimum-contacts inquiry. The House Report states:

> (b) Personal Jurisdiction.—Section 1330(b) provides, in effect, a Federal long-arm statute over foreign states (including political subdivisions, agencies, and instrumentalities of foreign states).   It is patterned after the long-arm statute Congress enacted for the District of Columbia.   Public Law 91-358, sec. 132(a), title I, 84 Stat. 549.   The requirements of minimum jurisdictional contacts and adequate notice are embodied in the provision.   *Cf. International Shoe Co. v. Washington*, 326 U.S. 310 (1945), and *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223 (1957).   For personal jurisdiction to exist under section 1330(b), the claim must first of all be one over which the district courts have original jurisdiction under section 1330(a), meaning a claim for which the foreign state is not entitled to immunity.   Significantly, each of the immunity provisions in the bill, sections 1605–1607, requires some connection between the lawsuit and the United States, or an express or implied waiver by the foreign state of its immunity from jurisdiction.   These immunity provisions, therefore, prescribe the necessary contacts which must exist before our courts can exercise personal jurisdiction.   Besides incorporating these jurisdictional contacts by reference, section 1330(b) also satisfies the due process requirement of adequate notice by prescribing that proper service be made under section 1608 of the bill.   Thus, sections 1330(b), 1608, and 1605–1607 are all carefully interconnected.

H.R. Rep. 94-1487, at 13–14 (1976) (footnotes omitted).

This subsection of the House Report explains the intent behind the FSIA's long-arm statute—which permits the district courts to exercise personal jurisdiction over a foreign sovereign whenever the federal courts have subject-matter jurisdiction over a claim and the sovereign has been properly served, 28 U.S.C. § 1330[1]—and the relationship between the

---

[1]In full, 28 U.S.C. § 1330(a) and (b) provide:

various provisions of the FSIA. It shows only that Congress believed that the contacts set forth in the immunity provisions satisfy due-process requirements. That assessment does nothing to change the meaning of "direct effect."

The House Report supports our conclusion that Congress intended that district courts exercise personal jurisdiction over a properly served foreign sovereign that performed an act outside the United States in connection with a commercial activity if that act caused a direct effect in the United States. It is a separate question whether Congress was correct in its assumption that this connection satisfies due-process requirements. If there is a minimum-contacts requirement for foreign sovereigns—a question the Supreme Court has left open, *see Republic of Argentina v. Weltover*, 504 U.S. 607, 619 (1992)—that issue is properly raised in a challenge to the district court's personal jurisdiction over the foreign sovereign, not its subject-matter jurisdiction over the claim, and a factual record would need to be developed accordingly. *See Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 760 n.8 (2d Cir. 1998) (noting it is "possible that a foreign sovereign could be subject to subject matter jurisdiction under the commercial activities exception without being within the personal jurisdiction of an American court").

Thus, I agree that the direct-effect requirement does not incorporate a minimum-contacts/due-process analysis.

---

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title [including the commercial-activity exception, § 1605(a)(2)] or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title [the service-of-process provision].